**D. C. ANDREWS & COMPANY, Inc.,**
v.
**UNITED STATES.**
No. 96–54.

United States Court of Claims.
July 19, 1961.

Stanley O. Sher, Washington, D. C., for plaintiff. Francis B. Goertner, Washington, D. C., was on the briefs.

Lawrence F. Ledebur, Washington, D. C., with whom was Asst. Atty. Gen., William H. Orrick, Jr., for defendant.

WHITAKER, Judge.

Plaintiff sues for commissions alleged to be due it as a cargo broker for the charterer of certain Government owned ships.

In commercial shipping the owner of the vessel is represented by a ship broker, while the owner of the cargo (the charterer of the ship) is represented by a cargo broker. The two brokers agree upon the terms of the charter for their respective principals, and are compensated by a brokerage fee which is paid to the ship broker, who then divides it with the cargo broker. Thus, in the commercial field of privately owned and operated ships, the brokers have many duties, the discharge of which requires extensive knowledge and skill in various technical areas.

The transactions here in suit involved Government owned vessels, as to which the responsible Government agency (the National Shipping Authority) specified all of the terms of the charters. The brokers, therefore, had very little to do to earn their commissions, as the facts herein recited reveal.

The Economic Cooperation Administration set aside certain grain products for emergency food aid to India. The Indian Supply Mission (hereinafter referred to as ISM), an agency of the Indian Government, was charged with the duty of effecting the transportation of the grain to India.

Due to the Korean hostilities, merchant vessels were not readily available in 1951. In order to supply the need for more bottoms, the National Shipping Authority (hereinafter NSA) was organized in March 1951 to withdraw from "mothballs" some of the Government's laid-up vessels and make them available for public use, such as the transportation of these Government-owned grain products to India. When this agency was organized it was contemplated some 100 of these laid-up vessels would be required, but this estimate was later raised to 500.

During December 1951 the NSA, on its own initiative, allocated 12 of these vessels for the carriage of this grain to India. Its general agents, who operated the vessels, were so notified, and also the ISM.

The securing of cargo for a vessel and agreement on the terms of the charter were the principal services rendered by ship and cargo brokers. In the case of these 12 vessels plaintiff rendered neither of these services, except for minor details. The NSA had allocated these vessels to ISM, without the interposition of the brokers, and it prescribed the terms of the charter for the vessels, except in minor matters.

At the time plaintiff's services were rendered, in private industry 2½ percent of the freight was the usual brokerage commission, divided equally between the ship broker and the cargo broker. When the NSA was organized in March 1951 it established 1¼ percent as the commission for the two brokers. However, it was later determined that this was too high in view of the little service actually rendered by the brokers and the volume of business done.

These are the background facts, and we come now to a statement of the facts upon which the controversy in this case turns.

At a conference held on November 7, 1951, between the NSA and the Association of Ship Brokers and Agents—called primarily, it is only fair to say, to devise means for eliminating lately sprung-up brokers not qualified in the business—representatives of NSA stated the brokerage of 1¼ percent was too high for the services rendered in cases such as this. It was proposed that no commission should be paid on freight charges in excess of $8.00 per manifest ton. It is stated that at this meeting the brokers' representatives present registered no objection.

About two weeks later another meeting was held at which the brokers' representatives opposed the reduction, because of its possible effect on brokerage commissions on private tonnage. A memorandum of the conference was made by one of the NSA officials which stated, *inter alia:*

"* * * While not receding from our intent to reduce brokerage, NSA agreed to withhold action pending receipt of a submission by the industry group * * * by * * * November 30th. * * * NSA also agreed to withhold temporarily the issuance of * * * [a] circular letter * * * which * * * contained a parenthetical statement regarding proposed reduction in brokerage."

Plaintiff was a member of the Association of Ship Brokers and Agents. Matters known to representatives of the Association were circulated among members, orally, and became matters of discussion among members and between

members and officials of NSA. Plaintiff, through its vice president, was fully conversant with developments relating to the proposed reduction of brokerage commissions as hereinabove described.

On December 21, 1951, NSA issued its Order No. 59. Pertinent excerpts follow:

"* * * This order authorizes maximum brokerage commissions payable for the servicing of voyage charter parties covering cargoes carried by vessels operated for account of the National Shipping Authority.

"* * * When an NSA vessel is fixed under WARSHIPVOY * * *, General Agent is authorized, in vessel's interest, to appoint an established chartering broker * * * to conclude the fixture and service the charter. General Agent may also acknowledge and recognize any broker or agent or freight forwarder nominated to the General Agent or to his selected chartering broker by the charterer as representing charterer's cargo interests.

"* * * For services rendered on vessels commencing to load during the period March 13, 1951 to and including December 31, 1951, total brokerage commission shall not exceed 1¼% of the freight * * *.

"* * * For services rendered on vessels commencing to load on and after January 1, 1952, compensation shall be as provided * * * except that on cargoes loaded in the Continental United States brokerage commission shall not be paid on that portion of the freight charges in excess of $8.00 per manifest ton. * * *"

The foregoing order was stamped as "filed and made available for public inspection, 8:53 a. m., December 29, 1951" by the Federal Register Division of the National Archives. It was published in the Federal Register on January 2, 1952.

Plaintiff's officers learned of the issuance of NSA Order No. 59 during the closing days of December 1951, but did not know its precise terms until its publication in the Federal Register.

All loadings in this case were after December 31, 1951, so that the terms of Order No. 59 apply to all shipments.

■ Oral agreements between a ship broker and a cargo broker, on the terms of the charter, including broker's commissions, are known in the trade as "fixtures". Later these fixtures are reduced to writing and constitute the charters of the vessels, with an important exception in this case, to be mentioned later.

All of these fixtures were entered into after the meetings in November, above referred to, but, except for three of them, before the date of Order No. 59, referred to above, and before plaintiff learned of its issuance. All of the charters, entered into following the fixtures, were signed by the general agents representing NSA after the date of Order No. 59, except one, and three or four weeks later they were signed by ISM.

Under these facts, a decision on whether plaintiff's rights are to be determined as of the date of the fixtures or as of the date on which the charters were executed would be difficult, but the Trial Commissioner has also found, to which there is no exception, that "NSA controlled all facets of the operation, including freight rates, terms and conditions of charter, and brokerage fees payable to ships' brokers and cargo brokers." He has also set out the terms of NSA Order No. 5, dated long before these transactions. It reads, in part:

"* * * This order authorizes freight rates and charter terms and conditions for the transportation of full cargoes of Grain in bulk under "WARSHIPVOY" form of charter * * * in vessels operated for the account of the National Shipping Authority, from * * * the United States to * * * India, effective on vessels commencing to load on and after March 13, 1951. * * *

"* * * The following clauses are to be inserted in * * * Part I of WARSHIPVOY; * * *

"*  *  * The contract is subject to the approval of the National Shipping Authority. *  *  *" [Italics ours.]

The subsequent Order No. 45, also issued before these transactions, approving a form of charter which increased freight rates, also contained a clause making it subject to the approval of NSA, and the charters actually executed in this case also contained this clause.

Four of the charters presented to NSA for approval contained a provision for brokerage of 1¼ percent on the full freight, but the NSA refused to approve them until they were amended to conform to Order No. 59. They were so amended. The charters for the eight remaining vessels all conformed to Order No. 59 when they were first presented to NSA for approval.

 The approval of NSA was a condition precedent to the formation of any binding contracts. Cathell et al., v. United States, 46 Ct.Cl. 368; Ship Construction Co., Inc. v. United States, 91 Ct.Cl. 419; Monroe v. United States, 35 Ct.Cl. 199, affirmed 184 U.S. 524, 22 S.Ct. 444, 46 L.Ed. 670. It follows that the oral "fixtures" were not binding contracts and plaintiff's rights to its commission became vested only when the written contracts were executed by the general agents for NSA and by ISM. This was after the date of Order No. 59 and its publication in the Federal Register.

The terms of the signed agreement between the parties provide for that compensation which has been paid.

Nor was plaintiff unaware of the proposed change in the rate of commissions when they agreed with the ship broker on the fixtures, and they knew at that time that any oral agreement entered into between the brokers were subject to the approval of NSA.

As a matter of fact, there was practically nothing for the brokers to agree upon, since the NSA prescribed the terms of the charters. The services rendered by the brokers before the date of Order No. 59 were negligible. Practically all the services they rendered were rendered after the date of the Order.

It seems to us clear that plaintiff is not entitled to recover. Its petition will be dismissed.

It is so ordered.

JONES, Chief Judge, and DURFEE, LARAMORE and MADDEN, Judges, concur.