**LOCKHEED AIRCRAFT COR-PORATION**

v.

**The UNITED STATES.**

**No. 46–65.**

United States Court of Claims.

May 15, 1970.

Numa L. Smith, Jr., Washington, D. C., attorney of record, for plaintiff. Charles D. Woodruff, Burbank, Cal., Clarence T. Kipps, Jr., and Miller & Chevalier, Washington, D. C., of counsel.

M. Morton Weinstein, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant. Steven L. Cohen, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

This is a follow-up of Lockheed Aircraft Corp. v. United States, 375 F.2d 786, 179 Ct.Cl. 545 (1967). As recited in that opinion, the Government and Lockheed entered into three fixed-price incentive contracts[1] for the production of a number of F–104 aircraft: Contract AF–27378 in 1954 and contracts AF–33700 and AF–33701 in 1956. The work was done in plaintiff's California plants, and certain political subdivisions of that state levied personal property taxes on Lockheed's non-government inventory and material. Prior to 1959, the Government administratively recognized, as allowable overhead cost, its *pro rata* share of these California personal property taxes on commercial, non-government material and work-in-process inventories, paid by Lockheed. In January of that year, however, for reasons

---

1. This type of contract is designed to encourage efforts to reduce costs by permitting the contractor to share in any savings realized in performance. After the agreement is entered into, and production begun, the parties negotiate a "target cost." The contractor's fixed fee is a percentage of that estimated price. Upon completion, the parties mutually determine the actual total costs. If the final total is below the target cost, the contractor, in addition to his fixed fee, is given a percentage of the amount "saved". If the final cost is higher than the target cost, but less than the cost ceiling—based on an agreed percentage above the target cost—the fixed fee is reduced by an amount equal to a certain percentage of the excess cost. If the final cost exceeds the ceiling, the contractor suffers a loss. For a numerical example, see *Lockheed I*, 375 F.2d at 787–788, 179 Ct.Cl. at 547–548. Since price is not finally set until after performance, one continuing source of dispute can, of course, be the definition of proper "cost" items. These problems are relegated by the contract to the "disputes" procedure.

discussed in our prior decision, the Government determined that it would no longer be responsible for such expenses, and informed the contractor that, while it would pay this cost through 1957, the Air Force's policy was to disallow this particular item as a cost in Government contracts after 1957. Lockheed protested vigorously, and both sides haggled over the effect of the new Air Force policy on the pre-existing 1954 and 1956 contracts. That controversy was settled by our 1967 decision in favor of the contractor.

After this dispute over the state taxes had erupted, Lockheed and the Air Force also entered into a new agreement for further production of the same plane. This is the pact involved in the present case. It began with a letter contract (AF-39027) in March 1959, and the parties then carried on negotiations over the target price for this new agreement. Following the freshly announced policy, the Air Force refused to acknowledge the personal property taxes as costs, but ultimately acquiesced in Lockheed's request to include the following clause in the formal contract, which was signed late in 1959 but made effective as of July 10, 1959:

Excluded from the target cost and target price of this contract are Personal Property Taxes arising as a result of the inclusion of Contractor's commercial productive material inventories and commercial work in process in the tax assessment base in the estimated amount of $183,643.00, as determined in accordance with the Con-

tractor's established accounting practices and procedures. The Government and the Contractor have failed to agree on recognition of this item of cost and the Contractor reserves the right to demand and receive promptly a written determination under the Disputes Clause of the contract with respect to the disallowance of this item provided he makes such demand by notice in writing to the Contracting Officer within thirty (30) days after receipt of an executed copy of this contract, or at such later date as the Contracting Officer and the Contractor may agree upon. In the event the Contracting Officer determines that these excluded costs are allowable, the contract target cost and target price shall be adjusted accordingly.

Under this provision, plaintiff appealed to the Armed Services Board of Contract Appeals from the refusal to recognize the taxes as allowable costs under this contract. The appeal was later dismissed by the Board upon the parties' agreement.[2]

Performance on Contract AF-39027 (the one now before us) was completed in 1960. In 1963, Lockheed and the Air Force negotiated the final price on this contract, concurring in all costs with the exception of the state taxes. Acceding again to Lockheed's request, the contracting officer included another savings clause in the supplemental agreement to the contract, re-emphasizing the difference of opinion over the allowability of the personal property taxes.[3]

---

2: With respect to this point, the parties' stipulation before the Board said: "The parties hereto agree that pursuant to the Government's Motion to Dismiss, dated 29 April 1963, the appeal under Contract AF33(600)-39027, ASBCA No. 6307, shall be and is hereby dismissed. The parties further agree that such dismissal completely and finally exhausts the appellant's administrative remedies with respect to appellant's claims under Contract AF33(600)-39027."

3. This second savings clause provided:
"The prices and the total adjusted costs established by this supplemental agreement include no amounts for costs incurred by the contractor for the years 1958 through 1962 for personal property taxes on contractor's commercial productive material inventories or commercial work in progress. The amount for such taxes excluded from total adjusted costs is $130,-999.10. The allowability of such costs was the subject matter of an appeal before the

Lockheed then brought this action to test its right to inclusion of the disputed taxes under Contract AF–39027. Both contestants have moved for summary judgment on the basis of a stipulation giving us the essential facts as to the parties' positions and the history of their negotiations. It is common ground that the plaintiff has exhausted all administrative remedies and that the suit is ripe for disposition.

The first thing to note is that each party has, all along, firmly maintained its separate stance on the allowability of these taxes under Contract AF–39027. In the discussions on the target costs and prices, in May and June 1959, the Air Force, through the Air Materiel Command, refused to recognize the taxes, and Lockheed insisted on them. In July 1959, Lockheed asked the Secretary of the Air Force to overturn the Air Materiel Command's treatment of the item. In October 1959 this request was officially rejected by the Assistant Secretary (Philip B. Taylor) with responsibility for procurement decisions at the highest level. After the contract was formally signed and approved in December 1959, the contractor again requested inclusion and the contracting officer again refused. As already pointed out, Lockheed appealed to the ASBCA, and it made other efforts to persuade the Air Force to change its mind. The controversy continued through the negotiation, in 1963, of final costs and prices on this contract. The two savings clauses set out above—one toward the beginning of the negotiations and the other at the end —demonstrate (and formally acknowledge) this consistent difference of opinion, never resolved by the parties.

In another era, a court might have held, in this situation, that the entire contract failed because the parties at no time meshed their positions on the point at issue, subjectively or objectively, but instead left an appreciable gap. Neither side makes that contention here. On the contrary, plaintiff argues that the Government is bound by the entire agreement, including the savings clauses, while the defendant maintains that Lockheed is tied by a contract signed with the knowledge that the Air Force would not pay the tax costs. The personal property taxes for which Lockheed seeks reimbursement are relatively small ($130,999.10) in comparison to the multimillion dollar price of the whole agreement. The problem is essentially peripheral; it does not go to the heart of the agreement or the undertaking. At the same time, as our prior opinion shows, the court is not left wholly at large in resolving it. The general terms and framework of the contract supply a sufficiently articulated design from which to fill in the break. The parties foresaw this possibility. The savings clause in the original contract specifically envisages a resolution of the issue through the "disputes" mechanism. In these circumstances, the persistent preservation of disagreement on the particular item is not enough to void the contract as a whole, or to render it unenforceable. See Purvis v. United States, 344 F.2d 867, 869–870 (C.A. 9, 1965); Beech Aircraft Corp. v. Ross, 155 F.2d 615, 617 (C.A. 10, 1946). The issue must therefore be determined under and within the formal contract.

The answer under the contract has already been *prima facie* indicated

Armed Services Board of Contract Appeals in ASBCA 6307. That appeal was dismissed with prejudice administratively pursuant to stipulation of the parties and it is agreed that such dismissal exhausts the contractor's administrative remedies with respect to the treatment of such costs in the establishing of final prices hereunder. The execution of this supplemental agreement is not to be construed as a waiver of any other rights that the

contractor may have for a judicial review as to the allowability of such costs hereunder or any rights that the government may have in the defense of such a judicial review, nor shall it be considered any agreement on the part of the government that the contractor has such rights. In the event of a judicial review and determination favorable to the contractor, the contract prices shall be adjusted accordingly."

in Lockheed I, *supra*, 375 F.2d 786, 179 Ct.Cl. 545. The parties have stipulated that the target and final pricing provisions in the fixed-price incentive contracts entered into by the Air Force and Lockheed during the period 1950 through 1959 vary somewhat in language, but in substance and in all respects pertinent to the current dispute are the same as those in the contracts adjudicated in our prior opinion. That decision was specifically made as one of law, on the basis of the contract structure and terms, and not rested on "plaintiff's alternative theory that the parties intended at the time of formation [of the earlier contracts] to allow these costs." 375 F.2d at 790–791, 179 Ct.Cl. at 553; see also *id.* at 567, 375 F. 2d at 799.[4] The defendant expressly disavows any argument that *Lockheed I* was legally wrong. The ASBCA has followed our decision. The Boeing Co., ASBCA No. 11866, 69–2 BCA para. 7898 (1969). Under the doctrine of collateral estoppel, the defendant may not contend now that, in the absence of any relevant new facts or circumstances, the holding between the parties on the same issue previously determined by this court should be rejected. Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L. Ed.2d 469 (1970); Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 597–598, 68 S.Ct. 715, 92 L.Ed. 898 (1948); Southern Pacific R.R. v. United States, 168 U.S. 1, 48–49, 18 S.Ct. 18, 42 L.Ed. 355 (1897). Even apart from collateral estoppel, we would follow the prior ruling as a precedent—if there is no significant change in the law or the circumstances—since the Government does not challenge its correctness.

The Government does urge, however, that there are important new external factors setting this 1959 contract (AF–39027) apart from the 1954 and 1956 agreements before us in *Lockheed I.*

The principal ground is that the manufacturer accepted this later contract—which was not finally signed until December 1959—after the defendant had revealed its intention to disallow these precise costs, and, in particular, after the Air Force had made it absolutely clear in Assistant Secretary Taylor's letter of October 26, 1959, that the disputed item would be categorically rejected. Defendant invokes the rule that if one party enters into an agreement knowing the meaning put upon a provision by his opposite number, he is bound by that interpretation. See Lykes-Youngstown Corp. v. United States, 420 F.2d 735, 743–744, 190 Ct.Cl. 348, —— (Jan. 1970); Sun Shipbuilding & Dry Dock Co. v. United States, 393 F.2d 807, 817–818, 183 Ct.Cl. 358, 376–377 (1968); Cresswell v. United States, 173 F.Supp. 805, 811, 146 Ct.Cl. 119, 127 (1959). *Cf* Helene Curtis Industries, Inc. v. United States, 312 F.2d 774, 779, 160 Ct.Cl. 437, 445 (1963); Franklin Co. v. United States, 381 F.2d 416, 419, 180 Ct.Cl. 666, 672 (1967).

■ But that rule presupposes that the bound party acquiesces—by silence, actual consent, or other conduct objectively manifesting acquiescence—in the other's expressed understanding. The principle can have no bearing where, as here, protest and disagreement are uttered before the contract is made, and maintained throughout. Lockheed consistently refused from the outset to accept the position of the Air Force, evidencing its disapproval through the savings clause in the original contract, letters to Air Force officials attacking that policy, continued requests for payment, and the inclusion of an additional savings clause in the 1963 supplemental agreement. In the face of this history, one could just as well say that the Air Force accepted Lockheed's position as vice versa. The Government has no spe-

---

4. The court held, as a matter of "contract interpretation", that "the personal property taxes which were assessed with respect to Lockheed's commercial productive material inventories and work-in-process inventories were costs of performing the three contracts in suit and that the method of allocation was proper." 375 F.2d at 799, 179 Ct.Cl. at 567.

cial standing to insist that contractors must accept its pre-contract reading of contract terms where the contractor openly refuses to do so. Of course, the parties can refuse to contract because of the disagreement. But if they do contract, neither one acquiesces and no compromise is reached, a court (or other adjudicating tribunal) must determine the question if it appropriately can. (See the discussion, *supra*, of contractual "gaps".) In this instance, neither side consented to the other's position; both preserved their disagreement for future resolution; and the issue was formally and forcibly kept alive by the savings clause in the original 1959 contract, as well as by that contained in the 1963 supplemental agreement. The first of these provisions expressly contemplated that the contracting officer might, and could, determine that the excluded costs were allowable. It is impossible to read these parts of the contract without concluding, first, that Lockheed, far from accepting or acquiescing in the Air Force's position, wholly rejected that viewpoint and intended to preserve its contrary attitude, and, second, that the Air Force knew full well that Lockheed was persisting throughout in its own thinking.

■■■ We cannot accept defendant's muted claim that the savings clauses were beyond the contracting officer's authority. There was no statute disallowing the cost of the state taxes. Nor was there, at that time (1959), any regulation prohibiting their allowance. At most, there was an announced "policy" of the Air Force, formulated in Assistant Secretary Taylor's letter of October 1959. A "policy" of this kind is not the equivalent of legislation or of a formally-promulgated regulation. By its own terms, the policy-letter constituted no more than the Secretary's "view of the appropriate policy to be followed in de-

termining allowable costs in cost-type contracts or allowable items to be considered in setting the amount of fixed-price contracts." Though the letter was expected "to be a governing principle in Air Force procurement", its text did not purport to withdraw authority from contracting officers (as a regulation might have done), nor did it attempt to change or supplement the Armed Services Procurement Regulations,[5] or even to issue a formal Air Force regulation. Contrast D. C. Andrews & Co. v. United States, 292 F.2d 280, 154 Ct.Cl. 460, 463–465 (1961). If the contracting officer and the Director of Procurement (who approved the contract) did depart from the "policy" expressed in the letter, by agreeing to the two savings clauses, they were not acting illegally or bereft of authority. Contracting officers do not go beyond their powers simply because they fail to follow a superior's "view [in a letter] of the appropriate policy to be followed." Moreover, it is far from clear, from the letter's wording, that it intended to preclude agreement on a savings clause leaving open for litigation the allowability of the taxes; the document's purpose may very well have been to go no further than to counsel against affirmative acceptance of allowability by the Air Force itself.

■ That the Department of Defense, through Armed Services Procurement Regulations, later adopted the policy of the Secretary of the Air Force, 32 C.F.R. 15–205.41(a) (5), as amended Nov. 27, 1962, 27 Fed.Reg. 11,664, is irrelevant since the contract at issue had been entered into and fully performed (performance was completed in 1960) prior to the time of this regulation (though the negotiations on final price came thereafter, in 1963). *Cf.* The Boeing Co., *supra*, 69–2 BCA ¶ 7898 (1969) (cost allowed as to contracts signed before 32 CFR § 15–205.41(a) (5) became effective).[6] The normal

---

5. The Assistant Secretary could not, on his own, have altered or added to the ASPR.

6. There is a question whether this regulation, which appears to be directed to cost-plus contracts (at least primarily),

rule is for legislation and regulations to be applied prospectively to events and agreements which occur later. See, *e. g.*, Greene v. United States, 376 U.S. 149, 159–160, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964); Union Pacific R.R. v. Laramie Stock Yards Co., 231 U.S. 190, 199, 34 S.Ct. 101, 58 L.Ed. 179 (1913). This is particularly true of directives dealing with the substantive aspects of contracts; it would be a rare regulation which would even seek to modify, to the contractor's detriment, substantive rights in an agreement already consummated.

Defendant cites Thorpe v. Housing Authority of City of Durham, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969) and Newport News Shipbuilding & Dry Dock Co. v. United States, 374 F.2d 516, 179 Ct.Cl. 97 (1967), for the broad proposition that a court must apply statutes and regulations in effect at the time it renders its decision, but neither opinion stands for that wide a principle. In the

first place, both involved regulatory changes *favorable* to the private party contesting with the government agency —not, as here, changes detrimental to the claimant.[7] Secondly, both concerned the effect of changes in *procedural* requirements and standards during the determination of a claimant's substantive rights.[8] Neither case held or suggested that a change in the law directly and adversely affecting an individual's vested and substantial contractual rights must be followed in the absence of a clear mandate that the change should be retroactive.[9] We do not sense any intimation that the 1962 regulation was intended to be retroactive with respect to a contract already performed. *Lockheed I* was decided by this court long after 1962, but we did not apply the 1962 regulation. We take the same course here.

One further, minor, argument by defendant calls for some mention. It quotes from a footnote in our prior *Lockheed* opinion (375 F.2d at 798, n. 15, 179 Ct.Cl. at 566, n. 15):

governs a fixed-price incentive contract of the type we have here. We leave this question undecided, assuming *arguendo* that the regulation would have applied to this contract if that had been made after the directive's effective date.

7. In *Thorpe*, there was a change in official guidelines, issued by the Department of Housing and Urban Development, requiring landlords of federally-assisted public housing facilities to hold a hearing and instruct a tenant as to the reasons for eviction, as well as to afford the right of reply by the tenant. Although the plaintiff had been given an eviction notice prior to the publication of the new HUD directives, she was still in possession of the premises at the time the new regulations were circulated. The Court held that since Mrs. Thorpe had not been evicted before promulgation of the departmental regulations, she was entitled to the better procedures guaranteed thereunder. 393 U.S. at 283, 89 S.Ct. 518.

In *Newport News*, we held, for the benefit of the contractor, that the ASBCA was required to follow revised ASPR guidelines in determining the reasonableness of profit in a contract en-

tered into prior to the revision of those standards. 374 F.2d at 530–534, 179 Ct. Cl. at 114–121. See, to the same effect, Bethlehem Steel Corp. v. United States, 423 F.2d 300, 191 Ct.Cl. —— (1970).

8. In *Thorpe*, furthermore, the Supreme Court gave no indication that it would have granted retroactive application to the new HUD procedural regulation had Mrs. Thorpe already vacated her residence at the time of her appeal.

9. In sum, in *Thorpe* and *Newport News* the Government agencies were required to follow revised procedural regulations, advantageous to the claimants, in force prior to a final determination of the plaintiffs' substantive rights. Here, however, the Government seeks retroactive application of its unilateral decision that the claimant, Lockheed, is not entitled to certain substantive rights which, without this new policy, were vested at least two years before the policy officially became a regulation. For a recent instance of a change in regulations, detrimental to the claimant, which was not applied retroactively, see Greene v. United States, *supra*, 376 U.S. at 159–160, 84 S.Ct. 615.

\* \* \* plaintiff's argument is helpful in demonstrating that there are certain costs which, though attributable to a particular activity, may be spread over all activities. This would have to be qualified by any special factors that would preclude universal allocation. This accords with our conclusion that the "but for" argument can be determinative only if an across-the-board allocation (required by cost accounting principles) *contravenes an announced policy*. We conclude that there is no evidence of such policy. [Emphasis added.]

The point defendant then seeks to make is that in this case, by contrast, there is "an announced policy"—the Air Force's 1959 policy—which across-the-board allocation would contravene. In that footnote, however, we were discussing the policy of the State of California in permitting allocation of costs with respect to the imposition of these taxes. That is made clear by the text of the opinion. See 375 F.2d at 799, 179 Ct.Cl. at 567 [10]. The reference was not at all to a federal policy.

■ The upshot of our consideration is that the decision in *Lockheed I* cannot properly be distinguished on any of the grounds suggested by the defendant, and therefore that that ruling is controlling here, too. We hold, accordingly, that plaintiff is entitled to recover $130,999.-10 as an allowable cost, representing the Government's *pro rata* share of personal property taxes paid to political subdivisions of the State of California on commercial productive material and work-in-process inventories.[11] The plaintiff's motion for summary judgment is granted and the defendant's cross-motion is denied. Judgment is entered for plaintiff in the amount of $130,999.10.

10. "Of course, California itself might as a matter of policy choose to avoid any possible clash of sovereignties by not taxing government work, but it cannot simply be assumed that is the policy, or if it is the policy, that it would extend immunity to the secondary degree argued by defendant."

11. As indicated in the savings clause in the 1963 supplemental agreement, see note 3, *supra*, there is no dispute over the amount of recovery.