**IOWA–DES MOINES NATIONAL BANK, Administrator of the Estate of David Mallon, Deceased, et al., Appellees,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, Appellant.**

**No. 71–1435.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 16, 1972.

Decided April 11, 1972.

H. Richard Smith, Des Moines, Iowa, for appellant; Ahlers, Cooney, Dorweiler, Allbee & Haynie, Des Moines, Iowa, of counsel.

William J. Koehn, Harlan D. Hockenberg, Stephen W. Roberts, Jon T. Griffin, Des Moines, Iowa, for appellees; Thoma, Schoenthal, Davis, Hockenberg & Wine, Des Moines, Iowa, of counsel.

Before MATTHES, Chief Judge, and LAY and ROSS, Circuit Judges.

LAY, Circuit Judge.

Midwest Mutual Insurance Company (hereinafter Midwest), policyholder on the life of Jules Jackson Mallon,[1] and others claiming to be beneficiaries, recovered $50,000, the face value of a group travel accident policy issued by Insurance Company of North America. The trial court submitted to the jury interrogatories respecting the various claims of the parties and on the basis of the answers returned entered judgment for the plaintiffs. On appeal the insurer asserts basically that the trial court erred in submitting to the jury the issue of the parties' intention respecting coverage, and alternatively, since the jury found there was no ascertainable mutual intention there could be no recovery under the policy. We affirm.

Midwest solicited through an independent insurance agent, Richard J. Noyce, bids for a group travel accident policy covering its employees. The evidence conflicted as to the respective intents of the parties at the time of the policy's issuance. Plaintiff's officials testified that although Midwest did not own a plane at the time of the initial application, Preferred Risk Mutual, another insurance company with which it had close ties, did own one. Mallon, the deceased, was a pilot as well as an executive for both companies and at times flew this plane on Midwest business. Noyce testified that he made specific inquiry as to whether Midwest owned their own plane since it affected the coverage and if full coverage was desired, an increase in the premium would be necessary. Noyce did not recall his conversation with a Midwest official in which he allegedly assured him that there would be coverage for company employees flying as pilots on Midwest owned or operated aircraft. His notes did reflect there was some mention of Mallon being a pilot but he stated his understanding was that Mallon would

---

1. At the time of his death Mr. Mallon was president of Midwest Mutual Insurance Company.

fly only on Preferred Risk business. The policy was thereafter issued.[2]

Some time after the policy was issued Midwest purchased Preferred's plane. Noyce then wrote INA and inquired whether there was coverage. An INA group manager replied:

"Our interpretation would read as I have underlined on this copy. It is not our intent to provide coverage in aircraft that is owned or operated by the Policyholder. I agree that the wording is confusing, but it [sic] the one that I have to live with."

This communication occurred on February 28, 1969. Shortly thereafter Noyce wrote to Midwest informing them of no coverage for those riding in the company plane. Noyce notified Midwest that if accidental death coverage was desired on the company owned plane the premium would have to be increased. The additional coverage would have increased the premium approximately ten times. It was conceded by an officer of Midwest, Robert D. Meyer, that both he and Mallon were apprised of INA's position. However, Midwest officials told Noyce that they construed the above clause as providing coverage for the privately owned plane piloted by their own personnel. On August 2, 1969, Mallon was killed while piloting the Midwest owned plane.

The court instructed the jury:

"The Court has instructed you that you could find in this case that the parties here had different intentions at the time of the making of the contract as to the meaning of the language used in Schedule II thereof.

"Section 622.22 of the Iowa Code provides as follows:

'When the terms of an agreement have been intended in a different sense by the parties to it, that sense is to prevail against either party in which he had reason to suppose the other understood it.'

"Section 622.22 imposes upon the parties to a contract the duty of acting in good faith. One party cannot go ahead upon its own theory and understanding of the terms of a contract with notice that the other party understood the contract in an entirely different manner and then, after a contract has been entered into or after a loss has been incurred, advise the other party for the first time that it was mistaken in its understanding of the terms and conditions of the contract.

"In this case if you find from all the facts and circumstances as shown by the evidence that one of the parties here knew or had reason to know that the other party intended, at the time of the making of the contract, a different interpretation of Schedule II thereof than that intended by the other party and failed to communicate its knowledge of such differing intention to that other party, then that other party's intention prevails as the intention of both parties as to the meaning of the language of Schedule II.

"If you find that one of the party's intentions as to the meaning of the language employed in Schedule II prevails in this case due to the requisites of this instruction, you will so indicate by placing the proper mark as

2. The clause which has led to this litigation reads as follows:

"(c) With respect to flying in aircraft, coverage shall not apply except while riding as a passenger, and not as pilot or crew member, on any transport aircraft operated by the Military Air Transport Service (MATS) of the United States of America or by the similar military air transport service of any other country; or on any civil aircraft, except one owned or operated by an Insured, a member of this [sic] household or the Policyholder, provided such covered aircraft (1) is operated by a properly certificated pilot, (2) has a current unrestricted airworthiness certificate, and (3) is not being used for fire fighting, pipeline inspection, power line inspection, aerial photography or exploration."

hereinafter instructed on Interrogatory No. 4."

The trial court submitted the interrogatories to the jury and the following answers were received:

"1. [Not relevant.]

"2. Do you find that it was the mutual intention of Midwest Mutual Insurance Company and Insurance Company of North America, at the time they entered into the contract of insurance, that coverage was to include travel in aircraft owned or operated by Midwest Mutual Insurance Company and include pilots?

"Answer: . . . 'no'

If your answer to Interrogatory No. 2 is 'No', proceed to Interrogatory No. 3.

"3. Do you find there was no ascertainable mutual intention on the part of Midwest Mutual Insurance Company and Insurance Company of North America, at the time they entered into the contract of insurance, because their contractual intent was not in harmony; that is, they did not intend the same result with respect to the coverage for loss arising from the operation of aircraft owned by the policyholder or coverage for pilots?

"Answer: 'Yes' . . .

If your answer to Interrogatory No. 3 is 'yes', proceed to Interrogatory No. 4.

"4. We, the jury, having found that there was no ascertainable mutual intent at the time the parties entered into the contract now find that the intention of the party indicated by our mark in this form controls, because of the requisites of Instruction 12.

⊠ Midwest Mutual Insurance Company, policyholder

☐ Insurance Company of North America, defendant."

The initial complaint on appeal is that the trial court erred in submitting the interrogatories to the jury since there exists only one reasonable interpretation of the policy in question, to-wit, that coverage is not provided for pilots operating company owned planes. We disagree. The plain meaning of the clause in question is not only confusing to a reasonable person standing in the shoes of the insured, but the language is admittedly confusing to the insurer as well. The syntax of the sentence structure is so befuddled that any number of meanings could be read into it. We find as one reasonable interpretation, that the passengers are covered on any aircraft; that pilots or crew members are not covered "on any transport aircraft operated by the Military Air Transport Service (MATS) of the United States of America or by the similar military air transport service of any other country; or on any civil aircraft, except one owned or operated by an insured. . . ."[3]

We do not find this construction to be unnecessarily strained. We agree that this is not the only interpretation and that the insurer's interpretation is a reasonable one as well. Clearly, the insurer and its agent, Noyce, considered it as not providing coverage and submitted a lower premium for the risk involved. According to the evidence Midwest officials understood it otherwise.

It is conceded Iowa law governs the case. In Iowa construction of the terms of an insurance policy is a question of law for the court. Brammer v. Allied Mutual Insurance Co., 182 N.W.2d 169, 172 (Iowa 1970); General Casualty Co. of Wisconsin v. Hines, 261 Iowa 738, 156 N.W.2d 118, 122 (1968). Iowa courts will apply rules of construction only where the policy is ambiguous in offering more than one reasonable interpretation. Mopper v. Circle Key Life Insurance Co., 172 N.W.2d 118, 124 (Iowa 1969); Randolph v. Fireman's

3. " 'Punctuation is a fragile basis' for construction of a contract but may assist although ordinarily of little aid." Aeroline Flight Service, Inc. v. Insurance Co. of North America, 257 Iowa 409, 133 N.W. 2d 80, 85 (1965).

Fund Insurance Co., 255 Iowa 943, 124 N.W.2d 528, 529 (1963). In each case the court is required to construe the policy according to the intention of the parties at the time the contract was entered into. Bjork v. Dairyland Insurance Co., 174 N.W.2d 379, 383 (Iowa 1970); Youngwirth v. State Farm Mutual Automobile Insurance Co., 258 Iowa 974, 140 N.W.2d 881, 883 (1966); Iowa National Mutual Insurance Co. v. Fidelity and Casualty Co. of New York, 256 Iowa 723, 128 N.W.2d 891, 893 (1964). Where the words of the policy cannot be interpreted on their face without the policy being subject to more than one reasonable interpretation, the court may turn to extrinsic evidence to ascertain the meaning of the parties. Charles Weitz's Sons v. United States Fidelity & Guaranty Co., 206 Iowa 1025, 219 N.W. 411 (1928); Transport Indemnity Co. v. Dahlen Transport, Inc., 281 Minn. 253, 161 N.W.2d 546 (1968); cf. Hamilton v. Wosepka, 261 Iowa 299, 154 N.W.2d 164, 168 (1967). If this evidence is conflicting it should be resolved by a jury. Brammer v. Allied Mutual Insurance Co., supra, 182 N.W.2d at 172–173; General Casualty Co. of Wisconsin v. Hines, supra, 156 N.W.2d at 122–123.[4] Applying these general principles of Iowa law to the policy in question, we conclude that the court properly submitted the question of the conflicting intentions of the parties surrounding the terms of the policy.

 The second question raised concerns the propriety of the court's in-

struction, previously set forth, and whether the trial court should have directed a verdict for the insurer once the jury found no ascertainable mutual intent. Section 622.22 of the Iowa Code reads as follows:

"When the terms of an agreement have been intended in a different sense by the parties to it, that sense is to prevail against either party in which he had reason to suppose the other understood it."

This is simply codification of a general principle from the common law governing contract law. Inman Mfg. Co. v. American Cereal Co., 133 Iowa 71, 110 N.W. 287–289 (1907); Peterson v. Modern Brotherhood of America, 125 Iowa 562, 101 N.W. 289 (1904); cf. Lockheed Aircraft Corp. v. United States, 426 F.2d 322, 326, 192 Ct.Cl. 36 (1970); Hurd v. Illinois Bell Telephone Co., 136 F.Supp. 125, 153 (N.D.Ill.1955), aff'd 234 F.2d 942, cert. denied, Seybold v. Western Electric Co., 352 U.S. 918, 77 S.Ct. 216, 1 L.Ed.2d 124 (1956). The rule is a restatement of the common law principle that a person is bound by the meaning that he induces another to understand, if he knows or has reason to know the meaning the other person will have. This is explained by Professor Corbin:

"In interpreting the words of a bargain, our common ideas of justice require that the court should give much less weight to what it thinks the party who used the words actually meant than to what it is convinced that the other party actually understood them

4. In dealing with the rule of construction that requires adoption of a reasonable interpretation in favor of the insured, the Iowa Supreme Court has recently said:
"We announced this rule in Sinclair and Co. v. National Surety Company, 132 Iowa 549, 557, 107 N.W. 184. 'As the provision in this contract was inserted by defendant and for its benefit, any ambiguity therein is to be taken strongly against the party who choses [sic] the language. * * * But it is said that this rule is resorted to only when all other tenets of construction fail.'

"Our recent pronouncements do not reflect such strict limitation of this rule. It appears to have been treated equally with other rules of construction. Be that as it may, such rule of construction, designed to aid in the interpretation of ambiguous contracts, does not prevail over a finding of the intention of the parties by a trier of fact based on evidence of facts and circumstances surrounding the transaction, the understanding of defendant and the practical construction he placed thereon." Phelan v. Peeters, 260 Iowa 1359, 152 N.W.2d 601, 604 (1967).

to mean, provided that they first knew or had reason to know that the second party did so understand them." 3 Corbin on Contracts, § 538 p. 63 (1960); see also, Restatement of Contracts, § 71 (1932).

Since the jury found no mutual intent, the court properly asked the jury to determine whether if the insurer or insured possessed different understandings *at the time the insuring agreement was entered into*, one party knew of the other party's different interpretation. There was evidence, if believed, from which the jury could find that Midwest officials made clear to Noyce that it wished coverage for its employees who might fly in company owned or operated aircraft. Mr. Fingert, an officer of Midwest, stated this was his understanding from the reading of the pertinent clause and that he clarified this matter with Mr. Noyce at the time the policy was issued. Though Noyce did not recall this conversation, we think its credibility was one exclusively within the domain of the trier of fact. The jury could thereby find that the insured had one understanding of the agreement and made this understanding known to the insured's agent.[5] On the other hand, if Midwest officials acknowledged that Noyce had made clear *at the time of the issuance of the policy* that INA construed the policy so as not to extend coverage, then regardless of their own independent interpretation they could not recover.[6]

The defendant, however, insists that once the jury found no mutual intent in special interrogatory number 3, this should have been the end of the case.

This contention ignores the purpose and meaning of § 622.22. We observe in retrospect, under the conflicting evidence the court would have been more correct if it had changed the form of interrogatory 4 to allow for a finding that neither party knew what the other meant or understood at the time the policy was accepted. However, there was no specific request for such a special finding as required under Rule 51 of the Federal Rules of Civil Procedure. Furthermore, the trial court instructed the jury that they were to mark interrogatory 4 "if they find" the party's intention controlling because of the requisites of instruction 12. The clear implication was that if the jury made no such finding they need not answer the interrogatory.

 Nor can we consider this omission plain error. Ordinarily, in contract law if there is no meeting of minds then no contract exists. However, as stated in 1 Williston on Contracts, § 95, pp. 349–350 (3d ed. 1957):

> "It is often said broadly that if the parties do not understand the same thing there is no contract. But . . . it is clear that so broad a statement cannot be justified. It is even conceivable that a contract may be formed which is in accordance with the intention of neither party. If a written contract is entered into, the meaning and effect of the contract depends on the interpretation given the written language by the court. The court will give that language its natural and appropriate meaning. . . . "

This is not the *Peerless* case where both parties had a different ship in mind.[7]

---

5. Although the insurer challenges Noyce's *authority as an agent to bind it*, we decline to entertain this question on appeal. It was not raised at trial. There was no objection to any conversations with Noyce nor to the court's instructions governing the authority of an agent to bind a corporation. Furthermore, the record demonstrates INA officials referred to Noyce as "our agent."

6. "[I]f the second party knows the meaning that the first party intended to

convey by his words, then he is himself bound by that meaning of the words. The same is true if he had 'reason to know what the first party intended.'" 3 Corbin on Contracts, supra at 64.

7. "A offers B to sell goods shipped from Bombay ex steamer 'Peerless.' B expresses assent to the proposition. There are, however, two steamers of the name 'Peerless.' It may be supposed, firstly, that A knows, or has reason to know this fact, and that B neither knows nor has

In the instant case a premium was paid, a contract entered into, a certain hazard insured against. It is agreed there was some kind of coverage purchased—only the extent of it is really at issue. The insurer cannot be entitled to a verdict on the ground that there existed no meeting of the minds simply because it is able to produce evidence showing that at the time the contract was executed the insurer disagreed with the insured over the contract's interpretation. Cf. Lamson v. Horton-Holden Hotel Co., 193 Iowa 355, 361, 185 N.W. 472, 474 (1921); Morrison-Knudsen Co., Inc. v. Phoenix Ins. Co. of Hartford, Conn., 172 F.2d 124, 128 (8 Cir. 1949).[8] Such an outcome would wholly defeat the law's well-founded position that where two reasonable interpretations exist, the one that will sustain the claim and cover the loss will be adopted over the interpretation which will defeat recovery. State Automobile and Casualty Underwriters by Automobile Underwriters v. Hartford Accident & Indemnity Co., 166 N.W.2d 761 (Iowa 1969); Eckard v. World Insurance Co., of Omaha, Nebraska, 250 Iowa 782, 96 N.W.2d 454 (1959); Service Life Ins. Co. of Omaha, Neb. v. McCullough, 234 Iowa 817, 13 N.W.2d 440 (1944).

The jury resolved the question of intent here. The court was relieved of the problem.

Judgment affirmed.

reason to know it; secondly, conversely, that B knows or has reason to know it and that A does not; thirdly, that both know or have reason to know of the ambiguity; or, fourthly, that neither of them knows or has reason to know it at the time when the communications between them take place. In the case first supposed there is a contract for the goods from the steamer which B has in mind. In the second case there is a contract for the goods from the steamer which A has in mind. In the third and fourth cases there is no contract unless A and B in fact intend the same steamer. In that event there is a contract for goods from that steamer." Restatement of Contracts, § 71, p. 76, Illustration 1.

8. "When the terms of a written contract have been chosen by one of the parties and merely assented to by the other, this fact will in some cases affect the interpretation that will be given to these terms by the court. After applying all of the ordinary processes of interpretation, including all existing usages, general, local, trade and the custom and agreement of the two parties with each other, having admitted in evidence and duly weighed all of the relevant circumstances and communications between the parties, there may still be doubt as to the meaning that should be given and made effective by the court. This doubt may be so great that the court will hold no contract exists. If, however, it is clear that the parties tried to make a valid contract, and the remaining doubt as to the proper interpretation is merely as to which of two possible and reasonable meanings should be adopted, the court will adopt that one which is less favorable in its legal effect to the party who chose the words." 3 Corbin on Contracts § 559 p. 262 (1960).