**UNITED TECHNOLOGIES
CORPORATION,
Appellant,**

v.

**The UNITED STATES, Appellee.**

No. 86–926.

United States Court of Appeals,
Federal Circuit.

Oct. 1, 1987.

George Ruttinger, Crowell & Moring, Washington, D.C., argued for appellant. With him on the brief was Alan W.H. Gourley. Also on the brief was Whilden S. Parker, Pratt & Whitney Aircraft, West Palm Beach, Fla., of counsel.

Karen S. Fishman, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. With her on the brief were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director. Also on the brief was Richard L. Hanson, Wright Patterson Air Force Base, Dept. of the Air Force, of counsel. Ronald A. Schechter and Jeanne A. Anderson, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., entered an appearance for appellee.

Before MARKEY, Chief Judge, NIES and NEWMAN, Circuit Judges.

NEWMAN, Circuit Judge.

United Technologies Corporation (UT) appeals the judgment of the Armed Services Board of Contract Appeals (Board) that Contract No. F33657–80–C–0218 (0218 contract) between UT and the United States (USG), providing for sale of F–16 aircraft engines to certain European Participating Governments (EPG or Consortium), is not subject to a Foreign Military Sales (FMS) factor. *United Technologies Corp.*, ASBCA No. 25540, 85–3 BCA ¶ 18,399 (1985). We affirm.

## OPINION

Upon appellate review, the Board's "decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence." 41 U.S.C. § 609(b). The Board's legal conclusions are not final or conclusive. *Id.*

At issue is UT's claim that it was entitled to charge to the EPG, as a FMS factor, certain independent research and development (IR & D) and bid and proposal (B & P) costs in excess of the negotiated ceiling for such costs. Extensive background details and findings appear in the Board's opinion, some of which will be referred to, but familiarity with all of which is assumed.

The Board's decision turned in significant part on certain government-to-government agreements between the United States and the Consortium countries: Belgium, the Netherlands, Denmark, and Norway. The United States and the Consortium entered into a 40–page Memorandum of Understanding (MOU) in June 1975, that stated the Not to Exceed (NTE) price and other basic terms of the arrangement. Pertinent to the Board's decision are, inter alia, the following provisions:

All terms and conditions applicable to the NTE price secured for the [USG] from its prime contractors GD [General Dynamics] and UT are accorded to the EPG.

*     *     *     *     *     *

The NTE price is based upon … a quantity of 1000 F–16 aircraft [of which 350 are for the EPG.]

*     *     *     *     *     *

[The USG] will procure the equipment and services required for the F–16 program under the most advantageous terms and conditions available consistent with DOD regulations and procedures and in accordance with this MOU.

The Board referred in its findings to the following provision of the 0218 contract:

### J–30—FOREIGN MILITARY SALES FMS FACTOR APPLICABILITY

(a) The Contractor agrees that it shall not require a foreign military sales factor to be applied to any foreign military sale now or in the future of the F100 engines … for use in support of either the F–15 or F–16 Weapon Systems, unless such a factor is provided for or permitted in the agreement between the U.S. and foreign Governments.

The Board also referred to the government's initial Request for Proposal, which stated that "no special profit factor" would accompany the foreign sales:

USAF and Consortium total quantities contemplated are 650 aircraft and 350 aircraft respectively.

1. See *General Electric Company,* ASBCA No. 24913, 83–1 BCA ¶ 16,130 (1982), *aff'd United States v. General Electric Corp.,* 727 F.2d 1567,

. . . .

Notwithstanding paragraph 3–808.6(b) of the Armed Services Procurement Regulation, no special profit factor … will be authorized for attendant risks and/or cost associated with foreign sales of the ACF [aircraft].

Further Board findings discuss an earlier contract between UT and the USG (the 0377 contract, executed in 1975), relating to the first deliveries of engines by UT in implementation of the MOU. As contemplated in the MOU, that contract provided for a "co-production delta" to cover the additional cost to UT of partial manufacture in Europe. However, in negotiating the 0377 contract UT had requested, and the USG had refused, to include excess IR & D and B & P costs as a FMS factor.

During negotiation of the 0218 contract UT again requested inclusion of the FMS factor, now relying on an intervening revision of the Defense Acquisition Regulations. DAR 6–1304.3(c), headed "Cost of Doing Business With a Foreign Government or International Organization", became effective on March 12, 1979.[1] UT asserted that the revised DAR now permitted recovery of excess IR & D/B & P costs as a FMS factor in sales of F–16 engines to the EPG. The pertinent portion of DAR 6–1304.3(c) states:

The provisions of Section 203, P.L. 91–441 do not apply to contracts for Foreign Military Sales. Therefore, the ceiling limitations or the formula constraints on [IR & D/B & P] costs … shall not be applicable to contracts for Foreign Military Sales. IR & D and B & P costs allowed on contracts for Foreign Military Sales shall be limited to their allocable share of the total expenditures….

The revised DAR, like the ASPR it succeeded, continued to provide that its application is limited by any conflicting government-to-government agreement. DAR 6–1304.4 states:

1568 (Fed.Cir.1984), for discussion of the ASPR prior to October 1978, and the 1979 revision of the DAR.

In the event a government-to-government agreement ... contains language in conflict with the provisions of ... 6–1304.3 above, the language of the government-to-government agreement shall prevail.

The United States did not accede to UT's request for a FMS factor, but did agree to inclusion of a "savings clause" in the 0218 contract whereby the parties agreed upon the amounts at issue, subject to judicial decision on the question of entitlement. The savings clause stated:

If it is subsequently determined by the Government or by a final decision of the Board or a Court of competent jurisdiction that the EPG engines ... are FMS items entitled to bear a full allocable share of the contractors IR & D and B & P costs, then the firm-fixed-prices ... shall be increased by the following amounts: ....

UT asserts that the Board failed to give proper weight to the savings clause. UT appears to suggest that by entering into a savings clause the government conceded merit to UT's position, a view not shared by the government or supported in law. Such a savings clause has been used to facilitate completion of negotiations, when the parties recognize that the resolution of the issue is not determinative of their entry into a binding contract. *Lockheed Aircraft Corp. v. United States,* 192 Ct.Cl. 36, 426 F.2d 322, 325 (1970); *see also General Electric Company,* 83–1 BCA at 80,105; *United States v. General Electric Corp.,* 727 F.2d at 1572 (discussing use of a savings clause "to provide for equity should there be a change in DOD policy"). The savings clause served to bring the issue before the Board, but as a matter of contract interpretation the Board correctly did not give the clause evidentiary weight.

The Board upheld the United States' position that UT's sales of engines to the EPG in accordance with the 0218 contract were not subject to recovery of a FMS factor. The Board found that the government-to-government agreements "contain language in conflict" with DAR 6–1304.-3(c). As is required by DAR 6–1304.4 the government-to-government agreements prevail; the Board correctly applied these agreements in resolving UT's claim. The Board's application of these agreements is in harmony with its findings that "the parties agreed that the amounts of IR & D and B & P in excess of the negotiated ceiling would not be included within the price of the entire 350 ACF available for EPG purchase" and that UT had "contracted away the right to request those amounts on the engines involved in these appeals...."

The Board's conclusion concerning the government-to-government agreements was based, inter alia, on Finding of Fact 23, wherein the Board emphasized the following clause of the MOU:

23. ... *All terms and conditions applicable to the NTE price secured for the [USAF] from its prime contractors GD and UT are accorded to the EPG....*

(emphasis and brackets by the Board). In Finding 39 the Board referred to bilateral Letters of Offer and Acceptance (LOA) executed in May and June of 1977 between the United States and each of the four EPG; each LOA included the basic provisions of the MOU. Finding 40 sets out the Board's interpretation of the LOA's:

40. After review of the LOA's, which are classified, we find that those government-to-government agreements provide that with the exception of the co-production delta, any Not to Exceed prices secured by the United States Government from appellant would be accorded the EPG, and the price to the EPG would be the total price to the U.S. Government....

UT does not dispute that if the government-to-government agreements conflict with its claim for payment of a FMS factor, then the government-to-government agreements prevail. *See General Electric Corp.,* ASBCA No. 20957, 80–1 BCA ¶ 14,425, at 71,117 (1980); *see also Hughes Aircraft Company,* ASBCA No. 21429, 80–1 BCA ¶ 14,329, at 70,637 (1980) (stating government's argument). UT argues, however, that the government-to-government

agreements restrict only the Not to Exceed price, and do not control what costs are included in that price. Thus, UT argues, the FMS factor is not barred by the government-to-government agreements. We have reviewed the Board's findings and conclusions, including their evidentiary support. Representative are the following:

The Board's Finding 13 concerns the negotiations that led to the basic agreement between the USG and the EPG, and states:

13. During the June-July meetings the United States offered to form a partnership with the EPG for the development, procurement, and production of one type ACF.... The United States and the EPG agreed to form a partnership and that the prices paid for the ACF procured for the EPG would not include a FMS factor and would be the same as the prices paid for the ACF procured for use by the USAF with the exception of the co-production delta for the EPG items....

The Board heard extensive testimony of witnesses for the USG, UT, and the EPG concerning the terms of the MOU and LOA, and made, inter alia, the following finding:

26. We find that the parties and the EPG understood that concerning no less than the 350 ACF purchased for the [EPG], appellant agreed (1) to delete its request for IR & D and B & P in excess of the negotiated amounts; and (2) that the same prices would be used for the engines procured for the EPG as those for the USAF with the exception that an additional amount for co-production would increase the price of the EPG engines....

In challenging these findings UT refers to the testimony of Colonel Carlberg, a member of the U.S. negotiating team. According to UT, Colonel Carlberg concluded in a 1976 memorandum that the MOU did not require that the EPG be charged the same prices as the Air Force, as long as the regulations were complied with. The government responds that UT has quoted from the memorandum out of context, and that Colonel Carlberg was referring only to

foreign co-production costs, which he called "a perfect example of the purpose and intent of 6–1304.3". Our review of the record shows no reference in the memorandum to excess IR & D and B & P costs as FMS charges. We conclude that the Board reasonably interpreted Colonel Carlberg's testimony, as well as that of other negotiators. For example, Finding 13 cites the testimony of Dutch negotiator Colonel Johan Harms that "it would not be possible for the United States Government to impose on [the EPG] other costs than we had identified already" in the MOU. With regard to the NTE price, Colonel Harms testified that:

There was no such thing as a FMS factor in it.... [I]n the LOA it says ... the US government has to pass on all rights to the EPG which it has in regard to the price.... If the U.S. government had the right not to pay a FMS factor, we had the same right.

Colonel Harms emphasized the Consortium's understanding that the F–16 program was not a typical foreign military sale for the United States. The testimony of USG and Consortium negotiators to this effect was uncontradicted, and all government witnesses testified that the concept of a partnership, in which some of the aircraft parts would actually be manufactured and assembled in Europe, was fundamental to the decision of the Consortium to select the U.S. aircraft. U.S. negotiator Major Clyde Spell testified that

it was envisioned that if the terms and conditions were found to be acceptable, that they [the EPG] would enter into a partnership arrangement to buy with the U.S. that system. [USG negotiator Fred Wood's] position was.... that the Europeans' requirements are that they don't pay more than we do because it is a partnership arrangement.

On the subject of whether the EPG relied on the absence of a FMS factor in the price, Colonel Harms testified:

Certainly, I would use a stronger term. ... [T]hey did not only rely on it, it was sure for them based on the documents that we had—that there wouldn't be any-

thing else than the price that the United States had to pay. Except for the delta cost of the production of course.

Finding of Fact 13 also cited the testimony of Dutch negotiator Franz Peter Schulte, that UT negotiator Clarkson "gave one price for all engines to be installed in that complete F–16 program" except for co-production costs.

The Board cited additional testimony, all of which constitutes substantial evidence in support of the Board's findings that the USG and the Consortium agreed that the Consortium was to be charged no more than the USG except for the co-production delta. Substantial evidence also supports the Board's finding that UT understood that the government-to-government agreements precluded recovery of excess IR & D/B & P costs. Major Spell testified that

> this had been communicated to [UT] on several occasions, that they could not charge any more for the EPG work than what they were going to charge us [USG] for it.

The Board thus rejected UT's argument that this understanding pertained only to the 0377 contract. The Board correctly applied the government-to-government agreements to the entire procurement, and the entire procurement is controlled by DAR 6–1304.4.

We have considered all of UT's arguments, including that based on DD form 1513, paragraph A.5.b., and UT's suggested interpretations of the LOA's and the various contractual arrangements.[2] We remark only on UT's assertion that Finding

55 is in conflict with Finding 40. The Board found in Finding 55 that the government-to-government agreements did not contain the details of charges to the EPG; Finding 40 states that the USG and the EPG agreed that the EPG would not be charged more than the USG (except for the co-production delta). We discern no conflict. The government-to-government agreements having stated the principle that the EPG would not be charged more than the USG, the absence from those agreements of specific reference to excess IR & D/B & P costs does not require the conclusion that the parties intended to make an exception of such costs.

Having found that all concerned understood, and the government-to-government agreements required, that the sales to the EPG would be accorded the same prices (except for the co-production delta) as the sales to the USG, the Board concluded that the change in DAR 6–1304.3 did not authorize a change in the charge to the EPG. This conclusion of law is correct, based on the board's findings, which we have upheld in accordance with the standard set by 41 U.S.C. § 609(b). UT's request to recover a FMS factor in contract 0218 was correctly denied.

AFFIRMED.

___

**2.** UT has raised the question of inconsistent findings and conclusions with contracts F–41608–79–G–0071 and F–41608–78–G–0034. The Board's decision on those contracts is not before this court. Any inconsistency does not affect the correctness of the Board's holding on the 0218 contract.