**M.A. MORTENSON COMPANY,
a Minnesota Corporation,
Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 90–390C.**

United States Court of Federal Claims.

Aug. 13, 1993.

---

David R. Frensley, Frensley & Towerman, P.C., Kansas City, MO, attorney of record, for plaintiff.

Shalom Brilliant, Commercial Litigation Branch, Civil Div., Dept. of Justice, Washington, DC, with whom were Terrence S. Hartman, Asst. Director, David M. Cohen, Director, and Stuart M. Gerson, Asst. Atty. Gen., attorneys of record, for defendant.

## OPINION

HORN, Judge.

## BACKGROUND

This case comes before the court following a contracting officer's final decision dated July 31, 1989, denying plaintiff's claim in the amount of $48,873.32 for repairs to the 90 Row fuel line of the B–1B support facilities' hydrant fueling system at issue, included in Count I of the complaint filed in this court, and following a contracting officer's final decision dated April 9, 1990, denying plaintiff's claim in the amount of $325,114.00 for repairs to the 70 Row fuel line of the same system, included in Count II of the complaint filed in this court. Plaintiff's motion to add Bristol Metals, Inc., the manufacturer of the pipe, as a third-party defendant was denied. After a lengthy period of discovery, the defendant filed a motion to dismiss Count II for lack of jurisdiction, alleging that plaintiff's Contract Disputes Act certification was defective, and a motion for summary judgment on Count I. In the alternative, the defendant requested summary judgment on both Counts I and II. Plaintiff opposed defendant's motions and filed a cross-motion for summary judgment on both Counts. Oral argument was held on January 8, 1993.

## FACTS

Most of the facts in this case are uncontroverted and set forth in an extensive joint stipulation filed with this court. Nonetheless, as is discussed more fully below, after a careful review of the record in the case, including the joint stipulations, and the extensive appendices filed separately by the parties, the court finds that the defendant's motion to dismiss should be denied and that there remain material facts in dispute so that summary judgment also should be denied.

On March 19, 1985, the United States Army Corps of Engineers, pursuant to an advertised invitation for bids, awarded a $27,437,200.00 construction contract to M.A. Mortenson Company, a closely held Minnesota corporation ("Mortenson"). The contract required construction of B–1B support facilities at Ellsworth Air Force Base (AFB), South Dakota, and included the installation of a hydrant fueling system, in accordance with specifications pre-

pared by the government. The system was placed into service in the spring of 1987, but, in early May 1988, a leak developed in the stainless steel piping in the 70 Row fuel line between Fuel Pits 707 and 708. In December 1988, a second leak developed in the 90 Row fuel line. At the time the leaks developed, the system already had been accepted and had been in use for more than a year. Moreover, the one-year warranty period, provided in the contract, covering Mortenson's construction work, had expired.

On May 19, 1988, the contracting officer sent a letter to Mortenson, notifying the company of the pipe failure and claiming that the failure was due to a latent defect. On May 24, 1988, Mortenson responded by letter disputing that the failure was caused by a latent defect. Mortenson and its mechanical subcontractor, Natkin & Company (Natkin), advised that the repairs requested by the government would be undertaken, with the understanding that, in the event that test results did not confirm a latent defect, the government would issue a contract modification to cover all costs. Mortenson also enclosed a letter, dated May 23, 1988 from Natkin, asserting that the pipe met A312 specifications, passed all tests required by the ASTM [1] for A312 pipe incorporated into the contract, and that the leak was caused by pressure surges and pressure fluctuations.[2]

On May 31, 1988, the contracting officer's authorized representative wrote to Mortenson to confirm the company's agreement to utilize Orr Metallurgical Service, Inc. (Orr), to perform laboratory tests on the allegedly defective pipe. At the same time, the government asserted that the

ASTM minimum pipe yield strength requirements had not been met, that the system design was adequate, and that the pipe weld failure was not due to excessive pressure levels in the hydrant fueling system.

Orr tested two sections of fourteen-inch diameter stainless steel pipe from the 70 Row, consisting of one four-foot section with a failure, and its adjacent eight-foot section. The eight-foot section from the 70 Row, which exhibited an apparent crack on the inside seam, met the requirements of a chemical analysis, a transverse tensile test, and a flattening test. On June 27, 1988, Orr issued its report and concluded: "the pipe does meet the requirements of ASTM–312. The fracture surface indicates that the failure was caused by cyclic loading." [3] The report revealed, however, that on the inside portion of the failed seam, the weld had wandered from the seam and had been returned to the seam in an abrupt manner, resulting in only partial fusion on the inside portion of the seam on both ends of the failure. Also, the middle portion of the failure showed no fusion at all. Nevertheless, the Orr report indicated that, although the wall thickness was less than normal, and the weld did have discontinuities, weld discontinuities are to be expected unless some type of Nondestructive Evaluation (NDE), is required on the weld seam. The report added that when 100% fusion and 100% penetration is required, it is normal to specify some type of NDE inspection. The Orr report conclusion, that the pipe supplied by Mortenson met the ASTM A312 requirement, was later confirmed by the report of Knott Laboratories, Inc., dated June 12, 1989, which also concluded that

1. American Society for Testing & Materials (ASTM) is a private group which sets standards and specifications for, among other items, piping. ASTM issues an annual book of standards which establishes both definitions and specifications for materials and products.

2. The plaintiff has conceded, however, that there was partial lack of fusion in some of the longitudinal weld, along certain lengths of pipe.

3. Cyclic loading has been defined by plaintiff's attorney, David R. Frensley as: "It is basically airplanes being pumped with gas or fuel so that the pressure in the pipe isn't constant but rather

cyclic...." In what has been commonly referred to by the parties as the CERL Report (CERL stands for Construction Engineering Research Laboratory of the Army Corps of Engineers), the following words are included:

Fatigue is associated with cyclic loading: that is, changes in stress levels during operation. In the case of the hydrant fueling systems, these stresses are associated with pressure excursions which result when valves are periodically opened and closed during aircraft fueling operations.

the pipe supplied by Mortenson met the requirements of ASTM A312 pipe.

Minimum pipe wall thicknesses and welding requirements were addressed in the contract specifications. Section 15R provides that "stainless steel pipe shall conform to ASTM specification A312, grade 304L," and ASTM 312 specifies an average wall thickness for a 14", 16" and 18" diameter steel pipe of 0.188", and a minimum wall thickness of no less than 0.164", or 12.5% under the average. However, the minimum wall thickness provisions (of ASTM A312/A530, and thus of the contract) apply only to pipe which has not been placed in service, because pressure, service, denting or working during installation may each affect the wall thickness of pipe, which as manufactured, met the minimum wall requirements. Sections 15R–14 through 15R–16 of the contract govern field joints, and provide that limitations on weld imperfections must comply with the requirements for 100% radiography testing set forth in American National Standards Institute (ANSI) Standard B31.3. Moreover, paragraph 8 of Section 15R–16 states that "all piping shall be tested by pneumatic pressure ... of 200 psi for not less than two hours," with no loss in pressure, only increases in pressure due to temperature. At no time was final test pressure to be less than 110 percent of maximum system operating pressure. The pressure testing was to be performed only after the welding inspection had been completed and the pipe was in its final position.

On December 22, 1988, the contracting officer's authorized representative notified Mortenson that a second break was suspected, in the 90 Row fuel line, 445 feet north of the isolation pit to Row 80. By letter, dated March 6, 1989, the contracting officer's authorized representative informed plaintiff that the government considered the failure to be a latent defect in the factory applied longitudinal weld in the sixteen-inch stainless steel pipe. In response, Mortenson notified the contracting officer that it disagreed and that plaintiff would make no further repairs of the 90 Row pipe. Furthermore, plaintiff indicated that it planned to submit a claim for the repair work under the disputes clause to the contract.

Government personnel, however, exposed the line, removed a section of the pipe, and shipped it to the Corps of Engineers Construction and Engineering Research Laboratory (CERL), to be analyzed by Dr. Ellen G. Segan. Dr. Segan issued a report on September 15, 1989 (the CERL Report). The CERL report included a number of appendices, including a summary of the work of Cipolla, Grover, et. al., which revealed a propensity of A312 pipe to have lack of fusion (LOF) defects. The stipulation includes the following excerpt from the report:

... ASTM A312 pipe contains LOF defects, many of which cannot be identified with conventional post weld-inspection techniques. The piping code recognizes this and does not permit ASTM A312 welded pipe to be used under severe cyclic loading. This pipe should not be used in cyclic applications unless the influence of LOF defects is specifically taken into consideration in the design.

The CERL Report also observed that in testing the A312 pipe removed from the 90 Row fuel line, there was evidence of a weld which was off center to the degree that no fusion had occurred on the interior surface, and that the interior weld had wandered, resulting in LOF, extending halfway through the pipe thickness. Other pipe sections near the failure showed LOF defects extending one-half to two-thirds of the pipe wall thickness. The CERL report included the following discussion: "Weld lack of fusion defects have been clearly demonstrated. The question becomes does a LOF defect constitute a lack of wall thickness? Common sense would dictate that the weld is part of the pipe wall and should be subjected to the wall thickness requirement."

The CERL report also analyzed the design of the hydrant fueling system, and offered the following observations: (1) There is no design code specifically for underground fueling systems. As a result, to design an underground fueling system,

the designer must use judgement in selecting and applying appropriate sections of the chemical plant and petroleum refinery piping code; (2) There is no specific requirement for weld quality for A312 pipe. All of the referenced specifications relate to performance under static loading and these tests will not determine performance under cyclic loading; (3) It is common practice in the pressure vessel industry to have specific requirements for weld quality and to make the weld inspection requirements part of the purchase specification, but no inspection requirements were specified in the instant contract.

The CERL report concluded that the pipe in the 90 Row fuel line failed due to fatigue, as cracks, initiated at LOF locations, grew under cyclic loading. Additionally, the report found that the manufacturer (Bristol) had delivered products which met acceptance tests even though the pipe contained LOF locations. Finally, the report advised that A312 pipe was not appropriate for the cyclic loading duty of hydrant fueling systems.

Moreover, with respect to the hydrant fueling system in this case, the parties stipulated that each length of pipe removed from both the 70 Row and 90 Row fuel line was welded on the exterior surface. At some locations, in the removed sections the interior weld had wandered away from the abutting surfaces, and at some of those locations it had wandered to the extent that there was no fusion of the interior abutting surfaces, even though there was fusion on the exterior. The contract also does not specify a weld inspection method, does not specify weld quality, and there is no requirement in ASTM A312 that the pipe weld have full penetration.

As a result of problems with longitudinal factory welds in piping and because of cyclic loading experienced in fuel systems,[4] at some point not specified in the joint stipulations, the standard criteria for hydrant fueling systems was changed from A312 welded to ASTM A358 welded or ASTM

A312 seamless piping. Moreover, the American National Standards Institute (ANSI) Standard B31.3 does not allow the use of A312 welded seam pipe for severe cyclic loading conditions.

In the instant case, the defendant does not dispute that severe cyclic loading conditions existed and that the ASTM standards do not recommend A312 welded pipe for use where such conditions exist. In fact, the parties stipulated that the hydrant fueling system at Ellsworth Air Force Base has severe cyclic loading conditions, and cyclic loading in the system is normal to its everyday operation. The defendant contends, however, that just because the contract specified A312 welded pipe, the contract specifications were not rendered defective.

On June 26, 1989, Mortenson submitted its claim for investigation and for the cost of repairs to the 70 Row leak in the amount of $325,114.00. In order to fulfill the requirements of the Contract Disputes Act, the claim certification submitted by the plaintiff was signed by Steven T. Halverson, Regional Vice President. At the time of the certification, Mortenson had demobilized the project office, the project manager had returned to Mortenson's Denver, Colorado office, no Mortenson personnel were located on site at Ellsworth Air Force Base, and the project was being administered out of Mortenson's Denver, Colorado office. The contracting officer denied this claim on April 9, 1990. The claim for $325,114.00 was later incorporated into Count II of the complaint filed in this court. Mortenson's claim for investigation and repairs to the 90 Row fuel line for $48,873.32 was denied by the contracting officer on July 31, 1989, and was incorporated into Count I of the complaint filed in this court. The claim for $48,873.32 was not required to include a certification pursuant to 41 U.S.C. § 605(c)(2) (1988), because it was for less than $50,000.00.

---

4. For example, hydrant fueling systems, other than at Ellsworth Air Force Base, such as at Diego Garcia Naval Base, which utilized ASTM A312 welded pipe also experienced failures. The A312 pipe at Diego Garcia was not, however, manufactured by Bristol.

## DISCUSSION

### Motion to Dismiss

In this court, defendant has submitted a motion to dismiss Count II of the complaint (the $325,114.00 claim) for lack of subject matter jurisdiction. The defendant maintains that the United States Court of Federal Claims lacks jurisdiction to hear plaintiff's claim included in Count II because it was not properly certified as required by the Contract Disputes Act. In the alternative, defendant has moved for summary judgment on both Count I (the claim for $48,873.32) and Count II.

▮ A motion to dismiss, pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC),[5] based on a challenge to the jurisdiction of this court, requires that the court reach its decision based on the evidence presented by the parties. The Supreme Court has clearly articulated, and the United States Court of Appeals for the Federal Circuit has explicitly adopted, the general standards for weighing evidence presented in a complaint when deciding a motion to dismiss, as follows: "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *accord Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir.1989). The court must accept as true any undisputed allegations of fact made by plaintiff. In evaluating a motion to dismiss for failure to state a claim, the court must presume all factual allegations in the complaint are true. *Miree v. De Kalb County*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977). *See also*

*Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686. If a motion to dismiss for lack of subject matter jurisdiction challenges the truth of the jurisdictional facts alleged in the complaint, the trial court may also consider relevant evidence in order to resolve disputed jurisdictional facts. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). When facts relevant to the issue of jurisdiction are disputed, the court is required to decide those facts. *Reynolds*, 846 F.2d at 747.

▮ The burden is on the plaintiff to establish jurisdiction. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Pasco Enters. v. United States*, 13 Cl.Ct. 302, 305 (1987); *Metzger, Shadyac & Schwartz v. United States*, 10 Cl.Ct. 107, 109 (1986). A motion to dismiss should not be granted by the court "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Furthermore, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). "[L]egal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." 2A James Wm. Moore & Jo Desha Lucas, *Moore's Federal Practice* ¶ 12.07[2.5] (2d ed. 1992).

▮ The Contract Disputes Act (CDA), 41 U.S.C. § 605(c)(2) (1978), as implemented by 48 C.F.R. § 33.207 (1984), states that a claim in excess of $50,000 shall be accompanied by a certification in accordance with the implementing regulation. The implementing regulation defines two limited cat-

---

**5.** By enactment of the Court of Federal Claims Technical and Procedural Improvements Act of 1992, Pub.L. No. 102–572, the United States Claims Court was renamed the United States Court of Federal Claims. In accordance with General Order 33 issued by the United States Court of Federal Claims, the court adopted the rules of the United States Claims Court. The substance of the rules of the court, discussed herein, is unaffected by the legislation, other than with respect to the name change of the court and, therefore, the name change of the rules. However, General Order 33 also indicates that if there is a conflict between the new statute and the rules, the statute will control. RUSCC stands for Rules of the United States Claims Court, now the Rules of the United States Court of Federal Claims, which is abbreviated RCFC.

egories of individuals who can legally certify a claim on behalf of a corporate contractor. As stated in the regulation: the first is a "senior company official in charge at the contractor's plant or location involved." 48 C.F.R. § 33.207(c)(2)(i). The other person authorized to certify under the Act is "an officer or general partner of the contractor having overall responsibility for the conduct of the contractor's affairs." 48 C.F.R. § 33.207(c)(2)(ii).

The certification requirement was enacted for the purpose of holding contractors personally liable for fraudulent claims. *See Skelly & Loy v. United States*, 231 Ct.Cl. 370, 376, 685 F.2d 414, 418 (1982); *Donald M. Drake Co. v. United States*, 12 Cl.Ct. 518, 519 (1987). The legislative history of the Contract Disputes Act evidences the importance Congress placed on the requirement that a claim be certified. Prior to the enactment of the certification requirement, Admiral Hyman G. Rickover testified on the importance of discouraging the submission of unwarranted contractor claims and proposed the addition of the certification requirement. *Contract Disputes Act of 1978: Joint Hearings on S.2292, S.2787 & S.3178 Before the Subcomm. on Federal Spending Practices and Open Government of the Senate Comm. on Governmental Affairs and the Subcomm. on Citizens and Shareholders Rights and Remedies of the Senate Comm. on the Judiciary*, 95th Cong., 2d Sess. 21 (1978). Admiral Rickover proposed that the CDA should:

> [r]equire as a matter of law that prior to evaluation of any claim, the contractor must submit to the Government a certificate signed by a senior responsible contractor official, which states that the claim and its supporting data are current, complete and accurate. In other words, you put the contractor in the same position as our working man, the income tax payer who must certify his tax return.

*Id.* at 21. Admiral Rickover contended that subjecting contractors to financial risk would greatly deter the submission of false or inflated claims. *See Paul E. Lehman,*

*Inc. v. United States*, 230 Ct.Cl. 11, 15, 673 F.2d 352, 355 (1982).

In accordance with 41 U.S.C. § 605(c)(1) (1988), the Contract Disputes Act, "[u]nless that [certification] requirement is met, there is simply no claim that the court may review under the Act." *W.M. Schlosser Co. v. United States*, 705 F.2d 1336, 1338 (Fed.Cir.1983) (quoting *Paul E. Lehman*, 673 F.2d at 355); *see also National Sur. Corp. v. United States*, 20 Cl.Ct. 407, 410 (1990); *Arlington Alliance, Ltd. v. United States*, 231 Ct.Cl. 347, 357, 685 F.2d 1353, 1359 (1982); *Ball, Ball & Brosamer, Inc. v. United States*, 878 F.2d 1426, 1428 (Fed. Cir.1989). Jurisdiction is an absolute concept; it either exists or it does not. *Universal Canvas, Inc. v. Stone*, 975 F.2d 847, 850 (Fed.Cir.1992) (citing *UNR Indus. Inc. v. United States*, 962 F.2d 1013, 1022 (Fed. Cir.1992)).

As discussed above, the Federal Acquisition Regulations provide that if the contractor is not an individual, only certain persons may execute a valid claim certification for the contractor:

> If the contractor is not an individual, the certification shall be executed by—
>
> (i) A senior company official in charge at the contractor's plant or location involved; or
>
> (ii) An officer or general partner of the contractor having overall responsibility for the conduct of the contractor's affairs.

48 C.F.R. § 33.207(c)(2) (1984).

During the last several years, the Court of Appeals for the Federal Circuit has written extensively regarding both the first and second prongs of the certification requirements included in 48 C.F.R. § 33.-207(c)(2). The court has been firm in its refusal to afford a broad reading to 48 C.F.R. § 33.207(c)(2), and instead has chosen to apply the regulation literally as written. *Ball, Ball & Brosamer, Inc. v. United States*, 878 F.2d 1426, 1428–29 (Fed.Cir. 1989). In *United States v. Grumman Aerospace Corp.*, the court cited to the regulation and wrote:

The first description demands that the certifying senior company official have both primary responsibility for the execution of the contract *and* a physical presence at the location of the primary contract activity.... The second description requires 'overall responsibility for the conduct of the contractor's affairs' in general. (Emphasis in original.)

*United States v. Grumman Aerospace Corp.*, 927 F.2d 575, 580 (Fed.Cir.1991).

The United States Court of Appeals for the Federal Circuit, however, has provided examples to help explain the concept of "overall responsibility for the conduct of the contractor's affairs." According to the circuit court, a corporate official with status equivalent to a Chief Executive Officer (CEO) satisfies the second prong of 48 C.F.R. § 33.207(c)(2), and the certifying official need not be the CEO. *United States v. Grumman Aerospace Corp.*, 927 F.2d 575, 581 (Fed.Cir.1991). For example, an executive vice president, as a corporate officer with overall responsibilities, may certify claims. *United States v. Newport News Shipbuilding & Dry Dock Co.*, 933 F.2d 996, 999 n. 3 (Fed.Cir.1991). Yet, an individual holding the title of vice president of accounting would appear to be inconsistent with the exercise of overall authority and, therefore, would lack the overall authority necessary to certify claims under the second prong of the regulation. *Universal Canvas, Inc. v. Stone*, 975 F.2d 847, 850 (Fed.Cir.1992). Moreover, a chief cost engineer, even one who is a senior level official with corporate authority to sign and certify claims, lacks the requisite general corporate authority. *Ball, Ball & Brosamer, Inc. v. United States*, 878 F.2d at 1427.

In a case decided earlier this year, the Court of Appeals for the Federal Circuit shed further light on the term "overall responsibility." In *Johnson Controls World Servs., Inc. v. Secretary of the Navy*, the court found that although a certifying official reported to a vice president/general manager, he, nevertheless, had overall authority sufficient to meet the second prong of the certification requirement included in 48 C.F.R. § 33.207(c)(2). As stated by the court, "[e]ven though an officer reports to another individual, he still may have overall responsibility for the corporation's affairs." *Johnson Controls World Servs., Inc. v. Secretary of the Navy*, 987 F.2d 738, 741 (Fed.Cir.1993). In determining whether a corporate officer has "overall responsibility," the court noted that although the corporate reporting relationship is a factor to be considered, an inquiry into the certifier's actual responsibilities must be made. *Id.* The court further observed that more than one officer in a corporation may have "overall responsibility," and, thus, meet the test in the second prong of the regulation. *Id.*

In *Johnson Controls*, The Court of Appeals for the Federal Circuit declined to either adopt a blanket rule for the test included in the second prong of 48 C.F.R. § 33.207(c)(2), or to precisely define the term "overall responsibility." Instead, the court seems to have adopted a "totality of the circumstances" test, much along the lines previously endorsed by this court in *Aleman Food Servs., Inc. v. United States:*

It is not sufficient to look to the title of the certifying official alone to determine whether he or she is qualified to execute the certification. The courts should employ a familiar standard: the "totality of the circumstances," to determine whether, at the time the certifications were signed, the certifying officer possessed the requisite "overall responsibility" to legitimately submit the claims under his or her signature.

*Aleman Food Servs., Inc. v. United States*, 24 Cl.Ct. 345, 353 (1991).

■ The Court of Appeals for the Federal Circuit also has indicated that when a plaintiff presents information to show that an individual was the proper official to certify a claim under the Contract Disputes Act, in order to create a genuine issue of material fact, and to preclude summary judgment, the government must offer some proof that the individual did not have the responsibility to certify claims, at the time the certification was signed. *United*

*States v. Newport News Shipbuilding & Dry Dock Co.*, 933 F.2d 996, 1000 (Fed.Cir. 1991). If the government offers no evidence to dispute plaintiff's claims of overall corporate authority and a title such as Executive Vice President suggests proper overall authority, then plaintiff may prevail and the certification will be deemed valid. See *Universal Canvas, Inc. v. Stone*, 975 F.2d at 850. Plaintiff may also prevail by overcoming the government's presentation that the certifying official did not have authority with proof of overall corporate responsibility.

■ In the instant case, the plaintiff has submitted an affidavit in support of its contention that Steven T. Halverson, Regional Vice President for the Western Region of the M.A. Mortenson Company, who signed plaintiff's claim for $325,114.00, was the appropriate certifying corporate official. Halverson, was one of four Regional Vice Presidents, all of whom reported to the President, M.A. Mortenson, Jr., of the closely held company. According to the affidavit submitted by Halverson, the general operations, conduct and control of the day to day affairs of the plaintiff corporation were handled by the corporation's Regional Vice Presidents, without a requirement that these decisions be reviewed by the President. The President, M.A. Mortenson, did not participate in, or review, any decisions on the claims asserted by the plaintiff, including whether or not to prosecute the claims at issue in the instant case. Halverson supervised Fred Van Vurst, Group Vice President for the Federal Contracting Group, who in turn supervised Bradley C. Funk, the Senior Project Manager for the Ellsworth AFB hydrant fueling system project.

At the time Halverson certified plaintiff's claim, no Mortenson personnel were located on site at Ellsworth AFB. The project office had been demobilized, and the project was being administered out of the plaintiff's Denver, Colorado office. After the demobilization, Halverson was the most senior company official in charge at the Denver, Colorado office, and was in charge of administering the project. Halverson represented the plaintiff in its contacts with the Government regarding the project, and had complete authority, control and responsibility over the project, including negotiations of all contract changes and claims. Halverson was empowered to make all decisions regarding the project on his own authority.

In addition to authority with respect to the Ellsworth AFB project, according to a joint stipulation entered into by the parties, Halverson had "plenary authority and responsibility for the general operation, conduct and control of the day-to-day affairs of Mortenson, while Mortenson's President devoted his time to business development, strategic planning and financial management." [6] Moreover, Halverson stated in his affidavit that "[i]n accordance with the Corporation's structure on June 26, 1989, I was an officer of the Corporation having overall responsibility for the conduct of the Corporation's affairs."

The Court of Appeals for the Federal Circuit has recently indicated its understanding of what it means to be "in charge."

> To be in charge within the meaning of FAR, a certifier need not be in charge of the plant or location, only of the contract (footnote omitted). Nor need he have direct supervisory authority over every aspect of the contract's performance, such as construction and engineering. Neither the regulation nor *Grumman* requires or even contemplates such parsing of a contractor's operations and corporate structure. But, a certifying offi-

**6.** Despite the stipulation in the record before the court which admits that Halverson had "plenary authority and responsibility for the general operation," the defendant, nonetheless, contends that his title was indicative of his actual authority. Defendant cites to an Answer to Interrogatory No. 11, by which defendant argues that Halverson's authority was limited only to the Western Region. Defendant's argument, however, is not persuasive given the facts presented in this case. Even in the answer to defendant's Answer to Interrogatory No. 11, the defendant indicates that Halverson's authority to bid and manage projects and to determine whether and when to file and settle claims, as opposed to making personnel decisions, is unqualified.

cial must have *'primary responsibility for the execution of the contract.'* *Grumman,* 927 F.2d at 580.

*Ingalls Shipbuilding, Inc. v. O'Keefe,* 986 F.2d 486, 489 (Fed.Cir.1993) (emphasis added). Therefore, despite Halverson's title as Vice President of the Western Region, it is clear that not only did he have overall authority for the conduct of the contractor's affairs, but, under the *Ingalls* test, he had responsibility for the contract at issue, as required by the second prong of the certification authority test. His authority does not seem to have been limited by geography, as his title might suggest. (*See Fischbach & Moore Int'l Corp. v. Christopher,* 987 F.2d 759, 765 (Fed.Cir. 1993), in which the court suggested that individuals who hold a title of regional vice president, absent other evidence in the record, have power limited by geography.) Accordingly, this court holds that under the second prong of 48 C.F.R. § 33.-207(c)(2), Halverson was a corporate official who could properly certify plaintiff's claims pursuant to the CDA.

Furthermore, plaintiff's contention that Halverson was an appropriate individual to certify CDA claims because he was a senior company official in charge at the contractor's plant or location involved, also is persuasive under the first prong of the regulation, 48 C.F.R. § 33.207(c)(7). It is uncontested that Halverson was in charge of administering the project, thus satisfying the "in charge" test enunciated in *Ingalls.* The only remaining question is whether Halverson met the "physical presence" test enunciated in *Grumman.* However, the instant case differs markedly from the facts in *Grumman.* In the instant case, the certification by Halverson was executed long after the contract had been completed and contractor personnel had been removed from the construction site. In other words, at the time of the certification, no Mortenson personnel were on site at Ellsworth Air Force Base, and the project office had been demobilized. In this particular situation, the only "contract activity" which could have occurred must have originated at the point of contract administration, that is, in plaintiff's Denver, Colorado office, where Halverson was located and in charge. To hold otherwise would be to suggest that once a contractor has demobilized from the construction site, there is no way to certify a claim under the first prong of the regulation. Accordingly, this court holds that, as in the instant case, when contract performance has been completed, and none of the contractor's personnel remain at the job site, the location of the primary contract activity for purposes of interpreting 48 C.F.R. § 33.207(c)(2)(i), can be the location of contract administration activity. *See Triax Co. v. United States,* 20 Cl.Ct. 507, 512 n. 6 (1990). Accordingly, Halverson is a proper individual to certify plaintiff's CDA claim under the first prong of 48 C.F.R. § 33.207(c)(2).

Because the court finds that Halverson was an appropriate individual, qualified to certify plaintiff's CDA claim, defendant's motion to dismiss Count II for lack of jurisdiction is **DENIED.** The court, therefore, turns to the issues raised in defendant's motion for summary judgment regarding Counts I and II, and to plaintiff's cross-motion for summary judgment on both Counts.

### Motion for Summary Judgment

Summary judgment in this court is properly granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of this court is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar in language and effect.[7] Both Rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

---

7. In general, the Rules of this court are closely patterned upon the Fed.R.Civ.P. Therefore, precedent under the Fed.R.Civ.P. is relevant to interpreting the Rules of this court, including Rule 56. *See Imperial Van Lines Int'l, Inc. v. United States,* 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States,* 17 Cl. Ct. 67, 70 (1989).

moving party is entitled to a judgment as a matter of law." Rule 56(c) of the Rules of this court provides that, in order for a motion for summary judgment to be granted, the moving party bears the burden of showing that there is no genuine issue of material fact and is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Rust Communications Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990); *Lima Surgical Assoc., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991).

■ Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990).

■ When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2510; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd,* 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. at 2511. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If, however, the nonmoving party produces sufficient evidence to raise a question as to

the outcome of the case, then the motion for summary judgment should be denied. As indicated above, any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

■ The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can show, alternatively, that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assoc.*, 20 Cl.Ct. at 679. If the moving party makes this showing, the burden is placed on the nonmoving party to show that a genuine factual dispute exists by presenting evidence establishing the existence of an element of its case upon which it bears the burden of proof. *Lima Surgical Assoc.*, 20 Cl.Ct. at 679. If, under no scenario, can the nonmoving party present the evidence to establish support for its case, then there should be no genuine need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Under Rule 56, the motion for summary judgment may succeed, whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. Generally, however, in order to prevail, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories and admissions, in order to show that a genuine issue for trial exists. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553.

■ The court has enjoyed the benefit of a considerable record, including extensive stipulations submitted by the parties

and affidavits, some of which offer expert opinions. Nonetheless, the record remains anything but dispositive of the case at bar. Neither party offers evidence which discredits the other side's theories. Accordingly, the court cannot resolve this matter on the documentary evidence offered in support of the cross-motions for summary judgment alone. In order to decide the case, it will be necessary for the court to hear the full presentation of the evidence, including the experts, at trial. This is in part due to the nature of disputes in which a party alleges the presence of latent defects, such as the case at bar. These disputes are fact laden and difficult to resolve on summary judgment. *United Technologies Corp., Sikorsky Aircraft Div. v. United States*, 27 Fed.Cl. 393, 399 (1992). In the instant case, at least, the following genuine issues of material fact remain in dispute:

1. Was the pipe supplied by Mortenson defective?

 (a) In welding a pipe, what procedures in the industry are considered "skillful and workmanlike?"

 (b) Within the pipe manufacturing industry, does a weld fall under the same specifications as the pipe wall?

2. If the pipe (and welding) was defective, was the defect latent, stated otherwise, can lack of fusion (LOF) defects be seen with the naked eye, or can they be discerned by a test required in the contract?

3. If there was a latent defect, did the latent defect cause the pipe to rupture?

Therefore, as is discussed more fully below, the defendant's motion for summary judgment and the plaintiff's cross-motion for summary judgment are **DENIED.** In order to provide the parties with guidance for presentation of their case as they prepare for trial, and to more fully explain the court's reasons for denying summary judgment, the court offers the following analysis.

As indicated earlier, plaintiff's claim first arose in May 1988, more than three years after the government awarded the contract to Mortenson, and a little over a year after the Air Force began utilizing the hydrant fueling system Mortenson had constructed. At the government's direction, Mortenson made repairs to the hydrant fueling system after the government had already accepted the system. By terms of the relevant contract, however, the government's rights after acceptance of the work were limited. Clause 52.246–12, which was incorporated into the contract by reference, reads, in relevant part, as follows:

> Unless otherwise specified in the contract, the Government shall accept, as promptly as practicable after completion and inspection, all work required by the contract or that portion of the work the Contracting Officer determines can be accepted separately. *Acceptance shall be final and conclusive except for latent defects*, fraud, gross mistakes amounting to fraud, or the Government's rights under any warranty or guarantee.

48 C.F.R. § 52.246–12(i) (1984) (emphasis added).

■ At the time of the system failure, the government's warranty rights had expired, and, to date, there have been no allegations of fraud or gross mistakes amounting to fraud. Accordingly, one of the only ways for the government to overcome the conclusive nature of its acceptance of the work under the contract is to claim and prove the existence of a latent defect.[8] In order to recover in this court on a latent defect theory, the government "must shoulder the burden of 'establishing the fundamental facts of liability, causa-

---

**8.** The plaintiff has argued, however, that the defendant's specifications were defective, for which the government must bear the risk. To this argument, defendant responds that because Mortenson did not comply with the government's specifications in the first place, a contractor, such as plaintiff, who had not fulfilled its obligations under the contract should not be allowed to claim protection under a defective specification theory, absent manifest inequity or a deviation from the specification which is entirely irrelevant to the alleged defect. *See Al Johnson Constr. Co. v. United States*, 854 F.2d 467, 469–70 (Fed.Cir.1988).

tion, and resultant injury.' " [9] *Roberts v. United States*, 174 Ct.Cl. 940, 956, 357 F.2d 938, 948–49 (quoting *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 351 F.2d 956 (1965)). *See also Pennsylvania Dep't of Transp. v. United States*, 226 Ct.Cl. 444, 450, 643 F.2d 758, 762 (1981); *Electronic & Missile Facilities, Inc. v. United States*, 189 Ct.Cl. 237, 253, 416 F.2d 1345, 1355 (1969).

■■■■ Although interpretation of the words which are included in and/or omitted from a contract, in general, is a question of law, questions of fact can arise as part of the analysis. *Big Chief Drilling Co. v. United States*, 15 Cl.Ct. 295, 300 (1988); *D. & S. Universal Mining Co. v. United States*, 4 Cl.Ct. 94, 97 (1983). When interpreting the language of a contract, a court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless. *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed.Cir.1985); *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir.1983). Otherwise stated, in ascertaining the intentions of the parties, the contract should be construed in its entirety "so as to harmonize and give meaning to all its provisions." *Thanet Corp. v. United States*, 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979); *ITT Arctic Services, Inc. v. United States*, 207 Ct.Cl. 743, 751–52, 524 F.2d 680 (1975); *accord Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971). The language of a contract, moreover, must be given meaning that would be derived from the contract by a "reasonably intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 388, 351 F.2d 972, 975 (1965).

■■■■ When a disagreement regarding the meaning of the words of the contract is presented to the court, the interpretation of words included in a contract is a two-step process. The court must determine first whether an ambiguity exists.

*John C. Grimberg Co. v. United States*, 7 Cl.Ct. 452, 456, *aff'd*, 785 F.2d 325 (Fed.Cir. 1985). If an ambiguity is immediately apparent, it is sometimes referred to as a patent ambiguity, then the plaintiff is under a duty to seek clarification. *George E. Newsom v. United States*, 230 Ct.Cl. 301, 303, 676 F.2d 647, 650 (1982). Although a potential contractor may have some responsibility to inquire about a major patent discrepancy, omission or conflicts in the provisions, he is not normally required to seek clarification of "any and all ambiguities, doubts, or possible differences in interpretation." *WPC Enters., Inc. v. United States*, 163 Ct.Cl. 1, 6, 323 F.2d 874, 877 (1963). If the plaintiff, however, does not inquire about a clearly patent ambiguity, then the ambiguity will be construed against it. If, on the other hand, the ambiguity is not patent, then the non-patent ambiguity will be interpreted against the drafter of the contract, as long as the other party's interpretation is a reasonable one. *E.g., Perry & Wallis, Inc. v. United States*, 192 Ct.Cl. 310, 316, 427 F.2d 722, 726 (1970). The alternative interpretation, however, must be within the "zone of reasonableness." *WPC Enters. Inc.*, 163 Ct. Cl. at 6, 323 F.2d at 877.

■■■■ When non-patent ambiguities exist, courts have traditionally allowed extrinsic evidence to be introduced in order to determine the intention of the parties at the time the contract was signed. The "unexpressed, subjective, unilateral intent of one party is insufficient to bind the other contracting party, especially when the latter reasonably believes otherwise." *Firestone*, 195 Ct.Cl. at 30, 444 F.2d at 551; *Singer–General Precision, Inc. v. United States*, 192 Ct.Cl. 435, 446–47, 427 F.2d 1187, 1193 (1970). Where, however, one party enters into a contract, knowing or having reason to know the meaning placed upon a provision by the other side to the conflict, the party is bound by that interpretation, if acquiescence to the other side's articulated understanding can be

---

**9.** It is uncontested that the government suffered an injury in this case, which is the third element necessary to prove a latent defect under the test

enunciated in *Roberts v. United States*, 174 Ct.Cl. 940, 357 F.2d 938 (1966).

shown. *Lockheed Aircraft Corp. v. United States,* 192 Ct.Cl. 36, 44, 426 F.2d 322, 326 (1970); *Cresswell v. United States,* 146 Ct.Cl. 119, 127, 173 F.Supp. 805, 811 (1959). The conduct of the parties before the advent of controversy, thus, may be relied upon to discover the parties' underlying intention. *Julius Goldman's Egg City v. United States,* 697 F.2d 1051, 1058 (Fed. Cir.), *cert. denied,* 464 U.S. 814, 104 S.Ct. 68, 78 L.Ed.2d 83 (1983); *Macke Co. v. United States,* 199 Ct.Cl. 552, 556, 467 F.2d 1323, 1325 (1972). Moreover, if the intent of the parties can be determined from words and other conduct, it is given considerable weight. *Alvin Ltd. v. United States Postal Serv.,* 816 F.2d 1562 (Fed.Cir. 1987).

For example, courts have allowed evidence of trade meaning, usage and custom to be employed to explain or define contract language, although such evidence could not be used to vary or contradict contract language. *Gholson, Byars & Holmes Constr. Co. v. United States,* 173 Ct.Cl. 374, 395, 351 F.2d 987, 999 (1965). Introduction of evidence of trade usage or custom has been allowed by courts to show that "language which appears on its face to be perfectly clear and unambiguous has, in fact, a meaning different from its ordinary meaning." *Tibshraeny Bros. Constr. Inc. v. United States,* 6 Cl.Ct. 463, 470 (1984) (citing *W.G. Cornell Co. of Wash., D.C., Inc. v. United States,* 179 Ct.Cl. 651, 376 F.2d 299 (1967)). Finally, where one party seeks to employ evidence of trade usage, summary judgment is inappropriate because trade usage is a "factual issue which must be proven." *D & S Universal Mining Co. v. United States,* 4 Cl.Ct. 94, 97 (1983).

## I. *Was the pipe supplied by Mortenson defective?*

In defendant's motion to dismiss or in the alternative, for summary judgment, the defendant contends that the pipe in question contained lack of fusion defects in the pipe weld when it was installed by Mortenson. However, throughout the plaintiff's and defendant's filings with the court, and at oral argument, there has been confusion regarding terminology and exactly what is meant by the words lack of fusion (LOF) and whether LOF is the same as a latent defect. Moreover, plaintiff and defendant have offered distinctly different interpretations of whether LOF at a pipe seam should be considered a defect.[10]

The defendant maintains that LOF represents a defect because at various points along the weld seams where there was LOF, the pipe segments did not meet the minimum wall thickness requirement in the contract specifications. The defendant also maintains that a weld which "was off center, to the point that no fusion occurred on the surface" of the pipe seam, violated the contract's specifications which required all work to be performed in a "skillful and workmanlike manner." Defendant cites clause No. 46 of the contract as proof that a LOF of the pipe weld constitutes a failure under the contract. The clause states: "All work under this contract shall be performed in a skillful and workmanlike manner."[11] Defendant argues that an interior weld that is off center or misses the seam altogether could not have been welded in a skillful and workmanlike manner. Defendant further maintains that a second weld pass made on the exterior of the pipe, but not on the interior, indicates that the welder was aware that the weld had wandered from the seam.

As support for the proposition that LOF of a pipe weld represents a "flaw," the defendant cites the declaration of Dr. Darryl F. Socie, a registered professional engineer hired by the Army to examine the pipe. Dr. Socie stated:

> [B]ased upon my observations and examinations of the removed pipe section, I concluded and it is my professional opin-

---

**10.** The declaration of Dr. Socie, cited by defendant in its motion, is helpful to understand the LOF concept. Dr. Socie observed locations where fusion was incomplete or non-existent, such that "cracks existed in the pipe seam ex-

tending approximately one-half to two-thirds of the pipe wall thickness."

**11.** *See* 48 C.F.R. § 52.236–5(c) (1984).

ion that the areas where fusion was either nonexistent or incomplete were caused by flaws in the welding process and existed at the time the pipe was delivered and subsequently incorporated into the hydrant fueling system at Ellsworth Air Force Base, South Dakota.

Moreover, the defendant argues that discontinuities in the weld allegedly constituted defects under the contract because the pipe failed to meet the contract's minimum pipe wall thickness requirement at the weld. Relying on Section 15R, subparagraph 3.1.3, of the contract specifications, defendant asserts that nominal (average) pipe wall thickness, in this case, should be a minimum of 0.188 inches, and actual wall thickness should be at least 0.164 inches.[12] As support, the defendant points to the report issued by Orr Metallurgical Service, Inc. (Orr), which found that wall thickness was only 0.161 inches at one location "near the weld." Defendant argues that the pipe wall thickness requirement also applies to the weld, which must be the same thickness as the base metal area of the pipe wall.[13] The defendant points to letters dated October 11, 1988 and January 19, 1990 from the ASTM as support for the notion that pipe thickness requirements also apply to the weld.[14] These letters suggest that the minimum wall provisions of table eleven of ASTM A530 also apply to the base metal and weld seam areas of each length of A312 welded pipe. Moreover, the letters from the ASTM indicated that satisfactory completion of the hydrostatic test does not obviate the need to meet these minimum wall provisions. The ASTM also indicated that wall thickness provisions require that the total depth of weld metal at the abutting seam surfaces of A312 welded pipe should equal or exceed the required minimum wall thickness.[15]

Plaintiff, however, contends that LOF in a pipe weld is not a defect because it does not violate any contract requirement, provision or specification, that no contract requirements for welds have been established in the contract, that all acceptance tests specified in the contract were met, and that the contract performance was accomplished in a workmanlike manner. In its cross-motion for summary judgment, plaintiff maintains that the defendant has failed to produce evidence that the pipe installed by Mortenson failed to meet contract specifications. Plaintiff points to the deposition of Maurice J. Zach, a professional engineer, and a designated representative of the government, who testified that he could find no requirement in ASTM A312 that both the interior and exterior surfaces of the pipe be welded. Furthermore, another professional engineer, Dean E. Orr, offered his opinion that the pipe met purchase specifications. Orr stated:

> It is the opinion of the writer that the pipe does meet the purchase specification. The wall thickness is less than nominal and the weld does have discontinuities. The weld discontinuities are expected when no type of Nondestructive Evaluation (NDE) is required on the weld seam. Therefore, a joint efficiency factor is used to take into account the less than 100% efficient weld. When 100% fusion and 100% penetration is required,

---

12. The contract stated that for seamless and welded pipe, "the minimum wall thickness at any point shall not be more than 12.5% under nominal wall thickness specified." Defendant argues out that the wall thickness requirement represents a design specification.

13. The contract specifications incorporated a technical standard written by the ASTM. On October 11, 1988, the task group of the ASTM subcommittee having responsibility for this standard wrote a letter to the Army offering its opinion that minimum wall provisions do apply to the weld seam.

14. The plaintiff objects to the admission in evidence of the letters from the ASTM subcommit-

tee, claiming that they would not be admissible at trial, and also because they do not represent the official position of the ASTM.

15. Notwithstanding the opinion offered by the ASTM subcommittee, in the deposition of William R. Sylvester, subcommittee chairman, he expressed his personal opinion that the subcommittee's interpretation of wall thickness requirements did not mandate that there be full penetration welds in the longitudinal seam of A312 pipe, but only that the depth of the inside and outside welds, taken together, must equal or exceed the required minimum wall thickness.

it is normal to specify some type of NDE inspection. This could be ultrasonic, eddy current, or radiographic.

In addition, plaintiff points to the CERL report, which found that the pipe met the tests specified in the contract. The CERL report, however, deferred on whether the interior LOF meant that the pipe violated the minimum wall thickness provision. The plaintiff also cites the CERL report to reinforce its point that the pipe wall and the weld should not be considered the same when interpreting the contract specifications. The CERL report stated:

> There is no specific requirement for weld quality. All of the specifications relate to performance under static loading. These tests will not determine the performance under cyclic loading. Weld lack of fusion defects have clearly been demonstrated. The question becomes does a LOF defect constitute a lack of wall thickness? Common sense would dictate that the weld is part of the pipe wall and should be subjected to the wall thickness requirement.[16] The question of whether the four failed pipes meet specifications will have to be addressed by the appropriate ASTM Committee. (footnote omitted). Clearly, the observed failures at the short service lives were associated with the deep LOF defects. The delivered products were generally able to meet the acceptance tests but there is question as to whether the pipe meets the minimum wall requirements in regions where there is lack of fusion.
> It is common practice in the pressure vessel industry to have specific requirements for weld quality and to make the weld inspection requirements part of the purchase specification. No weld inspection requirements were specified when purchasing this pipe therefore it could incorrectly be assumed by the supplier that weld quality was not critical. (Footnote added.)

In addition, plaintiff points to the testimony of another expert, Dr. Allen Selz.

Dr. Selz found that the pipe met the contract specifications and that the minimum wall thickness provision does not provide meaningful criteria to evaluate the weld. Further, Dr. Selz offered his opinion that if a pipe manufacturer failed to weld the inner 50% of an A312 pipe segment, as long as the pipe passed the hydrostatic, flattening, and tensile tests, the pipe would be acceptable. In various sections of his affidavit, Dr. Selz indicated:

> ASTM A312 and the documents incorporated in A312 do not state or specify requirements for the weld, weld fusion and weld penetration, and do not provide criteria to evaluate partial lack of fusion.... If A312 pipe has a partial lack of fusion on the outside surface, the pipe will sustain damage during the flattening test specified by A312. The flattening test will not demonstrate a partial lack of fusion on the inside surface of the pipe because the flattening test will squeeze the abutting surfaces together. The hydrostatic test specified by A312 will cause failure of the pipe if the lack of fusion is severe enough.

Dr. Seltz also stated that:

> The minimum wall thickness provisions of ASTM A312/A530 apply only to newly manufactured and unworked pipe which has not been placed in service. Pressures, service, corrosion in place, denting or working during installation may all affect the wall thickness of pipe which as manufactured met the minimum wall requirements. The minimum wall requirements are not meaningful criteria for evaluating weld fusion or lack of fusion.

And, Dr. Selz went on to write:

> ASTM A312 lists a number of properties requirements of the material and specifies, along with the incorporation of A530, certain mechanical tests and requirements. The specified tests and requirements are the transverse or longitudinal tension test, the flattening test, the hydrostatic test, and the requirement of Section 11.1 of A530 that, with regard to position.

16. The court notes that this sentence in the CERL report seems to support the defendant's

seamless and welded (no filler metal added) pipe, the minimum wall thickness at any point shall be not be more than 12.5 percent under the nominal wall thickness specified. The nominal wall thickness for the pipe sizes used in the hydrant fueling system at Ellsworth Air Force Base where the leaks occurred is .188 inches. The nominal wall thickness set out in the ASTM standards is used to determine the minimum wall thickness.

Moreover, Dr. Selz continued:

It is my professional opinion, since A312 states no requirement for weld penetration or weld fusion, that a length of A312 pipe which passes the tension test, flattening test, hydrostatic test, and which base metal material when new has the required minimum wall thickness, complies with ASTM A312.[17] (Footnote added.)

The common occurrence of lack of fusion in A312° welded pipe, the difficulty in detecting lack of fusion even with full longitudinal radiography, and the resulting failures are well known in the industry and were explored in a study published in May of 1980 by Cipolla, Grover *et al.*[18]

Plaintiff maintains that the pipe wall and the longitudinal weld are two entirely different things. As stated by plaintiff, the defendant's argument, "that 'common sense' means that the weld is part of the pipe wall takes a giant leap, devoid of common sense and at odds with the usual and ordinary meaning of 'weld' and 'wall.'" Plaintiff points to the Orr report as support for the notion that the pipe wall and the weld are not the same. Plaintiff argues that the Orr report noted that the pipe wall material is tested for its chemical properties, and by the tensile, yield and elongation tests, while the weld is tested by the flattening (for ductility) and hydrostatic pressure tests. Plaintiff again cites the Orr report for the proposition that the

weld, as an option, may be tested by radiography, ultrasound or eddy current. Finally, plaintiff points out that the defendant's own witness, Maurice Zach, who testified that the ASTM does not require a weld on the interior as well as on the exterior surfaces of the pipe.

In sum, plaintiff and defendant have offered sharply contrasting evidence on the issue of whether LOF at a pipe seam constitutes a latent defect or a defect. These issues remain for the court to decide at trial with the presentation of additional factual testimony, including expert testimony. While plaintiff's case may have been buttressed by the opinions of a number of experts, the court is struck by a contradiction in plaintiff's position regarding the interior weld. If, as plaintiff represents, it is not a defect for the interior weld to wander from the pipe seam, why did the pipe manufacturer go to the additional expense and effort of welding the interior seam? By the same token, the defendant has been less than convincing in demonstrating that contract specifications actually required that there will be no LOF defects on the interior seam, or that there must be an interior weld at all. The plaintiff argues that standards for welds do exist, and that to specify those standards in contracts is standard practice in the pressure vessel industry. Moreover, plaintiff contends that because these standards were not incorporated into the instant contract, either intentionally or unintentionally, weld quality was not considered critical.

Furthermore, although the defendant cites the Material and Workmanship clause of the contract, and asks the court to interpret the section, as a matter of law, what should be considered "skillful and workmanlike" with respect to welding pipe is a question of fact. Additionally, although contract interpretation is generally a matter of law, whether or not a weld is part of,

**17.** In this regard, plaintiff maintains that the sections of the pipe that leaked met the acceptance tests specified in the contract, pursuant to the tests specified in the ASTM (chemical analysis and tensile tests, flattening test, and hydrostatic test).

**18.** At oral argument both parties admitted that they were not aware of this report when the contract was signed.

or the same as, the pipe wall requires an understanding of relevant facts not now in the record. Although the plaintiff argues that the minimum wall thickness requirement does not apply to the weld, if the weld is part of the pipe wall, then the contract might be interpreted to require that weld thickness be the same as pipe wall thickness, as specified in the contract. Accordingly, summary judgment is not appropriate at this time.

II. *If the pipe (and welding) was defective, was the defect latent, stated otherwise, can lack of fusion (LOF) defects be seen with the naked eye, or can they be discerned by a test required in the contract?*

 A latent defect is one which cannot be discovered by observation or inspection made with ordinary care. *Kaminer Constr. Corp. v. United States*, 203 Ct.Cl. 182, 191–92, 488 F.2d 980, 984 (1973). Under the terms of the instant contract, a claim of "latent defect" avoids the effect of final acceptance in a government contract, however, the government must show liability, causation and resultant injury. *Joseph H. Roberts v. United States*, 174 Ct.Cl. 940, 956, 357 F.2d 938, 949 (1966). It is well-established in government contract law that the contract specifications are the standard for determining defects. *United Technologies Corp., Sikorsky Aircraft Div. v. United States*, 27 Fed.Cl. at 397. Defects which are readily discoverable by reasonable means of inspection, or not prohibited by the inspection and performance standards set forth in the contract, are not grounds for rejection of performance under the contract. *Southwest Welding & Mfg. Co. v. United States*, 188 Ct.Cl. 925, 957, 413 F.2d 1167, 1186 (1969). "Therefore, the government cannot impose a more stringent testing procedure or standard for demonstrating compliance than is set forth in the contract." *United Technologies Corp., Sikorsky Aircraft Div. v. United States*, 27 Fed.Cl. at 397–98 (citing *Southwest Welding & Mfg. Co. v. United States*, 188 Ct.Cl. 925, 951–53, 413 F.2d 1167, 1183–84 (1969); *see also SMS Data Prods. Group, Inc. v. United States*, 17 Cl.Ct. 1,

10 (1989)). However, "[t]he right to inspect does not imply a duty to inspect." *Kaminer Constr. Corp. v. United States*, 203 Ct.Cl. 182, 193, 488 F.2d 980, 986 (1973). When the Government fails to inspect as provided by contract provisions, it does not assume responsibility for any deficiencies which might have been discovered. *Id.*

As indicated above, "[l]atent defect disputes are often highly factual and difficult to resolve on summary judgment." *United Technologies Corp., Sikorsky Aircraft Div. v. United States*, 27 Fed.Cl. at 399. Defective welding is not a latent defect because this defect could have been discovered with proper inspection, such as radiography. *General Am. Transp. Corp. v. Sun Ins. Office, Ltd.*, 369 F.2d 906, 908 (6th Cir.1966). In *Southwest Welding & Mfg. Co. v. United States*, the court found that there is nothing latent about welding defects that were "readily discoverable upon any reasonable inspection prescribed by this contract or readily available." *Southwest Welding & Mfg. Co. v. United States*, 188 Ct.Cl. 925, 956–57, 413 F.2d 1167, 1186 (1969).

In this regard, the parties stipulated that the contract specified radiography of field installation welds as a method available to inspect factory longitudinal welds (in addition to ultrasound and eddy current). Additionally, the parties have also included the following in their joint stipulations:

Samples of the Ellsworth pipe contain welds which appear flawless to the naked eye.

The thickness of the pipe wall can be measured. If there is no lack of fusion of the weld, or if the lack of fusion of the weld is from one side, the depth may be measured. The presence of a lack of fusion between the interior and exterior weld may in some instances be detected by certain radiographic or ultrasound techniques.

The defendant maintains that the defects in the pipe installed by Mortenson were latent, and not discoverable upon a reasonable field inspection before, during, or af-

ter installation. As support for its contention that the alleged defects were not discernable upon reasonable inspection, the defendant cites the CERL report. This report concludes that many LOF defects "cannot be identified with conventional post-weld techniques." Additionally, this report references the Cipolla/Grover report:

Evidence from Cipolla and Grover suggests that potentially fatal flaws in A312 pipe cannot be found even with 100% radiography.

Defendant also cites to the declaration of Dr. Darryl F. Socie, given on September 9, 1991, a registered professional engineer hired by the Army to examine the pipe. Dr. Socie stated:

It is my further opinion that these areas where fusion was either nonexistent or incomplete were not observable by field inspection before, during or after installation.

The plaintiff contends, however, that the interior weld was plainly visible, and could have been seen by visual inspection even if the pipe's exterior was coated. Moreover, plaintiff also alleges that where there is a LOF, there is also a weld bead and a line of unfused material. According to plaintiff, the weld is different metallurgically and in grain size and structure orientation, such that a weld path of different texture and grain size is visible.

Further, plaintiff maintains that methods exist to inspect pipe welds. Plaintiff cites the affidavit of Allen Selz, Ph.D. as support:

Various methods are well known in the industry (see Orr Report Conclusions) to inspect the weld on A312 stainless steel welded pipe. Radiography is one type of nondestructive examination which has been well known in the industry, and the 1986 revision of A312 memorialized radiography of longitudinal welds as an option which a purchaser could specify. Because of the highly polished nature of the surface of stainless steel welded pipe, meandering of the weld pass can be seen by visual inspection. At issue at Ellsworth were interior weld passes,

which can be observed by visual inspection even if the exterior of the pipe is coated.

Plaintiff also cites the affidavit of Paul J. Soukup, Vice President of Natkin Company, which installed the pipe for the plaintiff.

I have looked on the interior of A312 welded pipe and observed the weld seam, which is plainly visible from one end of the pipe for a distance of no less than twenty feet. Because of the highly polished nature of the surface of A312 welded stainless steel pipe, interior surface meandering and other surface irregularities in the weld seam can be observed by visual inspection with the naked eye before and during installation unless the surface meanderings and other surface irregularities are of such a nature that the weld catches both interior surface abutting seams but leaves a void that can only be perceived using radiographic techniques.

The parties' sharp disagreement on this material issue of fact, whether the defects were observable on reasonable inspection, is also highlighted in both the defendant's and plaintiff's filings. For example, the defendant includes a proposed finding of uncontroverted fact which states: "The areas where fusion was either nonexistent or incomplete were not observable by field inspection before, during or after installation."

By contrast, the plaintiff's proposed findings of uncontroverted fact indicate:

Mortenson's affidavits and defendant's testimony state that A312 welded pipe walls have a bright surface polished in appearance, that the interior weld seam pass differs in appearance from the pipe walls and meandering of the weld may be observed by the naked eye. The Orr Report, the CERL Report, the CERL Report Follow-up, the Contract and the revised specifications for future Hydrant Fueling Systems indicate that the weld could have been inspected by visual inspection, radiography, eddy current, ultrasound or dye penetrant tests. Defen-

dant has produced no evidence to show that such inspection methods were not available. The only rebuttal advanced by defendant is that the exterior weld was obscured by protective coating on the pipe, but the only claim of defect relates to the interior weld.

Moreover, the parties' disagreement on this issue was also evident at the oral argument on the motions for summary judgment and the motion to dismiss, held on January 8, 1993. The extent of this disagreement is illustrated by the following, somewhat confusing, exchange which took place between the court and Shalom Brilliant, attorney for the defendant:

MR. BRILLIANT: Now, on the question of latency—

THE COURT: Was it observable or not?

MR. BRILLIANT: Well, we maintain, and I don't think they really dispute this, that the defect was not observable by reasonable inspection when the pipe was installed.

THE COURT: That is not what they say in 43(b) [Plaintiff's Proposed Findings of Uncontroverted Fact]. Do you want to look at 43(b)?

MR. BRILLIANT: They say it is not, but I don't [sic] that they pointed to any evidence whereas we had.

THE COURT: I will read it to you, "Ultimate findings of fact latent defect issue," and I will skip right over to (b), "Mortenson's affidavits and defendant's testimony state that A312 welded pipe walls have a bright surface, polished in appearance, that the interior weld seam pass differs in appearance of the pipe walls and meandering of the weld may be observed by the naked eye." It is offered as an uncontroverted fact.

MR. BRILLIANT: We don't controvert that statement.

THE COURT: You don't. But, you say, "The areas where fusion was either nonexistent or incomplete were not observable by field inspection before, during, or after installation."

MR. BRILLIANT: That's right. The two statements are consistent.

\* \* \* \* \* \*

MR. BRILLIANT: ... [Y]ou cannot see the lack of fusion, and that is a defect.

THE COURT: No, that is not what you said. And, there is something wrong with your submission, because this says in English that you can't see it by the naked eye. It says, "Not observable by field inspection before, during, or after installation." That covers the gamut.

MR. BRILLIANT: Yes, but that was the lack of fusion, not the weld path. The weld path can be seen. In some cases it can, and in some cases it can't. What we are saying is that the defect here, which was the lack of fusion could not be seen. The reason for that is this, first of all, the weld path in this case that we are talking about is on the inside of the pipe, because the pipe is covered with a protective coating that has to be there.

\* \* \* \* \* \*

MR. BRILLIANT: Well, no, because before installation but before construction. In other words, the pipe was delivered to the site with the protective coating. The government never gets to see the pipe before the protective coating is put on.

When asked to comment, however, plaintiff's attorney voiced a different opinion:

THE COURT: Let me stop you for a minute. Mr. Frensley, look at Number 19, the statement that Mr. Brilliant has made, "The areas where fusion was either nonexistent or incomplete were not observable by filed inspection before, during, or after installation." Do you, or do you not, agree with that statement?

MR. FRENSLEY: I disagree with it.

Later, Mr. Frensley elaborated on the observability of the alleged defect:

THE COURT: What about the observability of the defect? Let's talk about that for a moment.

MR. FRENSLEY: Okay. From my understanding—and, the defect is the wandering weld, that it could be seen. And, this is a situation where—

THE COURT: Not from the inside, but from the outside?

MR. FRENSLEY: You just look in the pipe.

THE COURT: All right.

MR. FRENSLEY: You just look in the pipe.

THE COURT: So, you are in agreement that the outside was coated and you can't see it?

MR. FRENSLEY: That's right.

THE COURT: But, if you kind of peered up the pipe—

MR. FRENSLEY: Just looked up the pipe, you would have seen it. As I understand it, it is very clear, because of the reflectability of the inside of that stainless steel pipe.

THE COURT: Now, Mr. Brilliant tried to draw a very subtle distinction that I labeled semantics and took issue with, and maybe it is and maybe it isn't semantics, with respect to the wandering weld as opposed to the structural integrity of the weld. What is your position on that?

MR. FRENSLEY: Well, of course, the government corporate representative said that it was the wandering weld which they classified as the defect, and it certainly would put the government—I believe the wandering weld is the defect, your Honor. And, if you look into the interior of the pipe and you saw a wandering weld, you got to know that there is a problem there.

Although both parties in their respective motions for summary judgment have represented that there are no genuine issues of material fact in dispute, it is clear from the above exchanges that not only do the parties disagree on the observability of the alleged defect, but they disagree on the nature of the alleged defect itself. To make matters even more confusing, each party points to a number of experts, offering conflicting opinions on the basic issue of whether the alleged defect can be observed upon reasonable inspection. Accordingly, the court finds that a genuine issue of material fact remains with respect to whether the alleged defects were observ-able upon reasonable inspection, and summary judgment on this issue is not appropriate at this time.

III. *If there was a latent defect, did the latent defect cause the pipe to rupture?*

A determination of what caused the pipe to leak represents a finding of fact. The defendant argues that LOF defects caused the pipes to crack under pressure. However, the plaintiff disagrees, and maintains that the pipe leaks were caused by cyclic loading, a use for which the pipe was not designed, but which should have been anticipated. As a result, there is another clear disagreement between the parties as to material facts of the case.

The significance of plaintiff's argument, moreover, is that if plaintiff is correct and the pipe failure was caused by cyclic loading, this may be an indication that the government's specifications were defective. The law is clear that the government warrants design specifications, and if such specifications are deficient, the government bears the risk and would be liable for the reasonable costs the contractor incurs. *Neal & Co. v. United States,* 19 Cl.Ct. 463, 467–68 (1990), *aff'd,* 945 F.2d 385 (Fed.Cir.1991); *Chaney & James Constr. Co. v. United States,* 190 Ct.Cl. 699, 421 F.2d 728 (1970). The theory of implied warranty for government design specifications was recognized early by the United States Supreme Court in *United States v. Spearin,* 248 U.S. 132, 136–37, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918). In *Spearin,* the Court upheld a judgment against the United States noting that: "if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." *Id.* at 136, 39 S.Ct. at 61. However, the Court of Appeals for the Federal Circuit has held that a contractor cannot rely on the government's implied warranty of plans and specifications, unless the contractor first complies with the specification, or attempts to do so. *Al Johnson Constr. Co. v. United States,* 854

F.2d 467, 470 (Fed.Cir.1988). The only possible exceptions might be in cases of manifest inequity or when a specification deviation is entirely irrelevant to the alleged defect. *Id.* Nevertheless, when, under a construction contract there are multiple imperfections giving rise to claims of latent defects and defective specifications, unless the defendant can make a reasonably accurate determination of the damages resulting from the latent defect, as distinguished from the costs incurred due to defendant's defective specification, then defendant cannot recover on its latent defect claim. *Joseph H. Roberts v. United States,* 174 Ct. Cl. 940, 957, 357 F.2d 938, 948–49 (1966).

As indicated, the plaintiff alleges that LOF did not cause the pipe leaks. Rather, plaintiff maintains that it was cyclic loading which caused the pipes to rupture, and such leaks would not have occurred in the absence of cyclic loading. In short, plaintiff contends that it should not have to bear the costs of the repairs to the hydrant fueling system because the pipe leaks were caused by overpressurization and cyclic loading, because of the faulty design of the system specifying A312 pipe, which has a tendency to have LOF defects and because the contract did not specify A312 pipe free from LOF.

Furthermore, relying on *Joseph H. Roberts v. United States,* 174 Ct.Cl. at 957, 357 F.2d 938, plaintiff argues that the "[d]efendant's proof must discredit cyclic loading, inadequate design and all other causes before it may pursue its latent defect claim, or at the very least, apportion between all other causes and the claimed defect." Plaintiff also argues that the defendant should have known that LOF in A312 pipe is common, and was made known to the industry in 1980, before the system at issue was designed, and before the parties entered into the contract.

The plaintiff relies on a number of experts to support the proposition that cyclic loading was a factor in the pipe ruptures at issue, among them, Dean E. Orr, P.E., of Orr Metallurgical Consulting Service, Inc. Orr states:

It can be concluded from this investigation that the pipe failed in the longitudinal weld seam at a location of lack of fusion due to cyclic loading. The mechanical and chemical properties meet the requirements of ASTM A–312, type 304–L. One location out of the fifty measured, near the weld seam, did measure less than the allowable for minimum wall thickness. The specified nominal wall thickness was 0.188″ and the mill is allowed to produce walls 12.5% below that, or 0.164″ in thickness.

Plaintiff also cites the CERL report:

Results of these studies and experience with hydrant fueling systems demonstrates [sic] that ASTM A–312 pipe contains LOF defects, many of which cannot be identified with conventional post-weld inspection techniques. The piping code recognizes this and does not permit ASTM A312 welded pipe to be used under severe cyclic loading. This pipe should not be used in cyclic applications unless the influence of LOF defects is specifically taken into consideration in the design. Unfortunately this was not done in the case of the hydrant fueling systems.

Additionally, the CERL report continued:

Welded ASTM A 312 pipe is not appropriate for the cyclic loading duty of the hydrant fueling systems. Fatigue due to cyclic pressure was not specifically addressed in the ANSI/ASME B31.3 piping code under which these systems were designed, but given the observed failures, fatigue must now be considered.

And, as further support, plaintiff cites the affidavit of Dr. Allen Selz:

I have seen photographs of the section of Row 70 pipe which shows outward bulging at the point of failure. Such bulging is known as plastic deformation and indicates overpressurization.

* * * * * *

Based on the Orr Report that the average thickness of abutting surfaces joined by weld was approximately one-half of the thickness of the pipe or .081 inches and Orr's ultimate tensile strength find-

ing of 83.8 KSI, the pressure surge causing the Row 70 line failure can be calculated at approximately 990 psi.[19] This pressure greatly exceeds the design and test pressure ... It is my professional opinion that the cause of the Hydrant Fuel System pipeline ruptures at Ellsworth Air Force Base was pressure cycling and/or overpressure and not partial lack of fusion. (Footnote added.)

Plaintiff also cites to the report of Knott Laboratories, which "reviewed the available reports, codes and standards, designs, correspondence, and operational data in the form of strip chart records pertaining to the JP–4 fuel line failures at Ellsworth Air Force Base" at the request of Bradley C. Funk, Project Manager for M.A. Mortenson Company. After a review of the above-referenced documents, Knott Laboratories concluded that "the causes of the JP–4 fuel line failures were due to errors in the design of the system by the Army Corps of Engineers, and the poor operational practices by Air Force personnel."

In addition to the expert opinions discussed earlier, plaintiff also references the affidavits of Maurice Zach and Joe Pesek. Zach, who was presented as a designated representative of the government,[20] admitted that the United States Army Corps of Engineers overlooked fatigue analysis, or the effects of cyclic loading, when the Corps designed the hydrant fueling system. Moreover, Zach admitted that the design of the system was not adequate. Zach also agreed with the conclusion included in the CERL report that "severe cyclic operating conditions exist at Ellsworth Air Force Base and the welded A312 pipe is not appropriate for hydrant fueling systems." Zach agreed that "[c]yclic loading of the system is normal to its everyday operations." He agreed that if fatigue analysis and cyclic loading were considered at the time of design, A312 welded seam pipe would probably not have been chosen.

A second designated representative of the government, Joe Pesek, was the primary mechanical designer of the hydrant fuel system. Pesek also admitted that the cyclic loading condition of the hydrant fueling system was not taken into consideration at the time of the hydrant fueling system's design. Apparently, cyclic loading was perceived as a problem only after the CERL report was issued.

In contrast to plaintiff's contention that the leaks were caused by cyclic loading, defendant maintains that the ruptures were caused by LOF defects. In support of its position, defendant also cites to the CERL report, and notes the finding in the report that "the maximum operating pressure never exceeded 250 psi which is within the design pressure of 275 psi for this system." Moreover, the defendant contends that it is irrelevant whether the specification of A312 welded pipe was a defective specification, because a defective specification claim is available only to a contractor who has complied with the specification in the first place.

Defendant does not dispute that cyclic loading was among the factors which caused the pipe ruptures, nor does defendant dispute that severe cyclic loading conditions existed and that the ASTM standards do not recommend A312 welded pipe for use where such conditions exist. However, defendant submits that the reason why A312 welded pipe is not recommended for severe cyclic loading conditions is that it may contain LOF defects, many of which cannot be identified with conventional post-weld inspection techniques. Although defendant appears to acknowledge that there is a significant risk that such pipe will contain latent defects, defendant appears to maintain that the pipe installed by Mortenson would not contain LOF defects if the plaintiff complied fully with the contract specifications, specifically, the pipe wall thickness requirements, including weld seams, and installation of the pipe in a

19. The CERL report, however, includes the following statement: "Both data sets show that the maximum operating pressure never exceeded 250 psi which is within the design pressure of 275 psi for this system."

20. Zach also indicated that in his statements he was representing the opinion or position of the government.

skillful and workmanlike manner. In other words, according to defendant, plaintiff had a duty to supply pipes without LOF defects, and unless plaintiff met those conditions, plaintiff cannot rely on a defective specification theory. As with the previous two issues, determination of the cause of the pipe ruptures requires further factual information. Accordingly, the causes of the pipe ruptures represent genuine issues of material fact in dispute, and summary judgment is inappropriate.

## CONCLUSION

Cases which revolve around alleged latent defects are difficult to resolve on summary judgment. Clearly, there are genuine issues of material fact remaining in the above-captioned case which require resolution at trial, including those regarding whether there were defects under the term of the contract, whether those defects were latent, and what caused the pipes to rupture.

Defendant's motion to dismiss Count II is **DENIED.** Defendant's motion for summary judgment on Counts I and II is **DENIED.** Plaintiff's cross-motion for summary judgment on Counts I and II is **DENIED.** By separate order, the court will schedule a status conference to set dates for further proceedings.

**IT IS SO ORDERED.**